COMMONWEALTH of Pennsylvania, Appellee

v.

Terrance WADDELL, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 1, 2012.
Filed Nov. 21, 2012.

Gary B. Zimmerman, Pittsburgh, for appellant.

Rebecca G. McBride, Assistant District Attorney and Michael W. Streily, Deputy District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: BENDER, J., DONOHUE, J., and STRASSBURGER, J.*

OPINION BY BENDER, J.

Appellant, Terrance Waddell, represented by Attorney Gary B. Zimmerman,[1] appeals from the judgment of sentence of an aggregate term of 5–10 years' incarceration and consecutive 5 years' probation for drug and firearm offenses. Appellant argues that marijuana, now recognized by at least fourteen of our sister states as having accepted medical uses, no longer fits the criteria for a Schedule I controlled substance and, therefore, the statutes currently prohibiting possession of marijuana as a Schedule I substance are invalid. Appellant also argues that the physical evidence should have been suppressed because the police did not have exigent circumstances justifying a warrantless entry and search of his home. After careful review, we reverse.

Appellant was arrested following the warrantless entry into his home, ostensibly justified upon the presence of exigent circumstances, resulting in the discovery of approximately ten pounds of marijuana and several firearms. The Commonwealth charged Appellant with three counts of person not to possess a firearm (PNPF), 18 Pa.C.S. § 6105; two counts of receiving stolen property (also related to the firearms), 18 Pa.C.S. § 3925; one count of possession with intent to deliver (PWID) (marijuana), 35 P.S. § 780–113(a)(30); one count of possession of a controlled substance (marijuana), 35 P.S. § 780–113(a)(16); and one count of possession of drug paraphernalia, 35 P.S. § 780–113(a)(32).

Appellant filed a pre-trial motion seeking suppression of the seized contraband, and another seeking dismissal of the drug charges premised upon the argument that marijuana was no longer a Schedule I controlled substance within the meaning of The Controlled Substance, Drug, Device and Cosmetic Act (hereinafter the "Drug Act"). The trial court denied both motions. A stipulated non-jury trial was held and the trial court found Appellant guilty of all the charged offenses.

In compliance with the applicable mandatory minimum sentences, the trial court sentenced Appellant to 5–10 years' incarceration for one count of PNPF, a concur-

---

* Retired Senior Judge assigned to the Superior Court.

1. At oral argument, Attorney Zimmerman, an accomplished and zealous advocate for many years, indicated that this was his last argument before our court due to his pending retirement. We are sorry we could not accept his first argument, thereby legalizing marijuana in our Commonwealth, but we nevertheless wish him well.

rent term of 5–10 years' incarceration for PWID, and 5 years' probation to commence upon Appellant's release from confinement for a second count of PNPF. No further penalty was imposed at the remaining five counts. Appellant was also ordered to forfeit $32,176.00.

Appellant now raises the following issues for our consideration:

I. Did the trial court err and thereby deny the appellant Due Process of law as guaranteed by . . . Article I[,] section 9 of the Pennsylvania Constitution and the 5th and 14th Amendments of the United States Constitution when it denied the appellant's Motion to Dismiss the Criminal Information charging him with possession with the intent to distribute marijuana, as a Schedule I substance in violation of 35 [P.S. § ] 780–113(a)(30)?

The scientific, medical and empirical data and evidence clearly established that marijuana has many acceptable medical uses in the United States, and therefore failed to meet the requirements of 35 [P.S. § ] 780–104 in Schedule I, which requires that a substance must have a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision. Since there are many recognizable medical uses for marijuana, it cannot be a Schedule I Controlled Substance. Thus, was this prosecution, conviction and judgment of sentenced [sic] a violation of the constitutional protection of Due Process of Law as guaranteed by . . . Article I[,] section 9 of the Pennsylvania Constitution and the 5th and 14th Amendments of the United States Constitution?

II. Did the court err in denying the appellant's motion to suppress evidence seized as a result of a warrantless search of his house where the commonwealth failed to establish by clear and convincing evidence that . . . exigent circumstances existed which created an exception to the Warrant Clause of Article 1[,] Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution?

Appellant's Brief, at 9.[2]

We begin with Appellant's first claim that marijuana no longer fits the definition of a Schedule I controlled substance as set forth in 35 P.S. § 780–104.

When interpreting a statute, the court must ascertain and effectuate the intent of the legislature and give full effect to each provision of the statute if at all possible. 1 Pa.C.S.A. § 1921(a); *Commonwealth v. Brown*, 423 Pa.Super. 264, 266, 620 A.2d 1213, 1214 (1993); *Commonwealth v. Edwards*, 384 Pa.Super. 454, 460, 559 A.2d 63, 66 (1989), *appeal denied*, 523 Pa. 640, 565 A.2d 1165 (1989). In construing a statute to determine its meaning, courts must first determine whether the issue may be resolved by reference to the express language of the statute, which is to be read according to the plain meaning of the words. 1 Pa.C.S.A. § 1903(a). *See Commonwealth v. Berryman*, 437 Pa.Super. 258, 649 A.2d 961 (1994) (en banc).

When construing one section of a statute, courts must read that section not by itself, but with reference to, and in light

---

**2.** Appellant's statement of the questions presented omits his argument that police also lacked probable cause justifying an exception to the warrant requirement. A review of Appellant's Pa.R.A.P. 1925(b) concise statement and his statement of the same issue at the beginning and within the body of his argument-in-chief demonstrate that the argument has not been waived.

of, the other sections because there is a presumption that in drafting the statute, the General Assembly intended the entire statute to be effective. 1 Pa.C.S.A. § 1922. *See Commonwealth v. Mayhue*, 536 Pa. 271, 307, 639 A.2d 421, 439 (1994); *Commonwealth v. Berryman*, *supra* at 268, 649 A.2d at 965. Statute headings may be considered in construing a statute. 1 Pa.C.S.A. § 1924. However, the letter of the statute is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S.A. § 1921(b); *Commonwealth v. Reeb*, 406 Pa.Super. 28, 34, 593 A.2d 853, 856 (1991), *appeal denied*, 530 Pa. 665, 610 A.2d 45 (1992).

*Commonwealth v. Lopez*, 444 Pa.Super. 206, 663 A.2d 746, 748 (1995).

■ Furthermore, when addressing the constitutionality of a statute, we are guided by the following standards:

It is axiomatic that: "[A]ny party challenging the constitutionality of a statute must meet a heavy burden, for we presume legislation to be constitutional absent a demonstration that the statute 'clearly, palpably, and plainly' violates the Constitution." *Konidaris v. Portnoff Law Associates, Ltd.*, 598 Pa. 55, 953 A.2d 1231, 1239 (2008) (citation omitted). The presumption that legislative enactments are constitutional is strong. *Commonwealth v. McMullen*, 599 Pa. 435, 961 A.2d 842, 846 (2008); *see also* 1 Pa.C.S. § 1922(3) (in ascertaining intent of General Assembly in enactment of statute, presumption exists that General Assembly did not intend to violate federal and state constitutions). All doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster. *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383, 393 (2005). Moreover, "statutes are to be construed whenever possible to uphold their constitutionality." *In re William L.*, 477 Pa. 322, 383 A.2d 1228, 1231 (1978).

*DePaul v. Commonwealth*, 600 Pa. 573, 969 A.2d 536, 545–46 (2009).

Appellant posits that because there are a growing number of states and scientific authorities that recognize medical uses for marijuana, the intoxicating herb can no longer be classified as a Schedule I controlled substance, as Schedule I controlled substances are defined as such, in part, by the absence of recognized medical uses. Thus, Appellant claims that principles of due process demand that prosecution under the provisions of the Drug Act which prohibit various activities relating to controlled substances (in this case the possession and the possession with intent to deliver controlled substances), is barred with respect to marijuana as marijuana ostensibly has ceased to qualify as a Schedule I controlled substance under the Drug Act. Appellant contends that our long-held principle that criminal statutes are to be strictly construed supports this interpretation. We disagree.

Appellant was charged under the following provisions of the Drug Act:

(16) Knowingly or intentionally possessing a controlled or counterfeit substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, unless the substance was obtained directly from, or pursuant to, a valid prescription order or order of a practitioner, or except as otherwise authorized by this act.

. . .

(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practi-

tioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. § 780–113(a)(16), (30).

The schedules of controlled substances are defined by 35 P.S. § 780–104. That statute begins by stating that "[t]he following schedules include the controlled substances listed *or to be listed* by whatever official name, common or usual name, chemical name, or trade name designated." 35 P.S. § 780–104 (emphasis added). The statute then proceeds to define five schedules of controlled substances. The provision identifying Schedule I substances states:

(1) Schedule I—In determining that a substance comes within this schedule, the secretary shall find: a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision. The following controlled substances are included in this schedule:

. . .

(iv) Marihuana.

*Id.*[3]

We first analyze Appellant's claim that marijuana has some accepted medical use in the United States. At a hearing held pursuant to Appellant's motion to dismiss, the Appellant offered evidence demonstrating that fourteen of our sister states have passed legislation legalizing the use of marijuana for medical purposes.[4] Two additional states, Arizona and Maryland, have adopted law recognizing the medicinal use of marijuana without fully legalizing the use of medical marijuana.[5] Our own review of available legal resources suggests that Appellant understates his case in this regard. Connecticut, Delaware, Virginia, and Washington, D.C., have also all adopted laws allowing for the use of medical marijuana in certain circumstances.[6] Noticeably absent from those lists, however, is the Commonwealth of Pennsylvania. Nevertheless, we decline to accept the proposition that there is some critical mass of sister states that would render the question of accepted medical use a foregone conclusion. Whether there are accepted medical uses for marijuana is inherently a scientific question that cannot be directly resolved by public referendum.[7] In any event, the manufacture, distribu-

---

3. Under the Drug Act, "marijuana" is spelled: "marihuana." These words are interchangeable, though "marijuana" appears more frequently in conventional usage. Either term refers to the *genus* of flowering plants known as *Cannabis,* including the species *Cannabis sativa, Cannabis indica,* and *Cannabis ruderalis.*

4. These states and the date of passage of the relevant legislation are listed as follows: Alaska (1998), California (1996), Colorado (2000), Hawaii (2000), Maine (1999), Michigan (2008), Montana (2004), Nevada (2000), New Jersey (2010), New Mexico (2007), Oregon (1998), Rhode Island (2006), Vermont (2004), and Washington (1998).

5. Arizona allows physicians to prescribe medical marijuana. Maryland's law is perhaps

the most tepid of all states, providing only that the medical use of marijuana may be presented as a defense to criminal charges.

6. Furthermore, in the 2012 election, Massachusetts joined the list of states permitting marijuana usage for medical purposes in limited circumstances when voters there approved a ballot initiative. Arkansas voters, confronting a similar ballot measure, narrowly rejected legalizing medical marijuana (51% against). And Montana voters passed a measure placing additional restrictions on the permissible use of marijuana as medicine.

7. Nonetheless, it is now beyond doubt that there is a growing popular acceptance of marijuana as medicine in the political arena; a national poll conducted in 2010 by the Pew Research Center found that 73% of respon-

tion, and possession of marijuana remain illegal under federal law, even when such activities promote the use of marijuana exclusively for medicinal purposes.[8]

Marijuana's recent resurgence as a maligned-substance-turned-cure-all is not surprising. Four-thousand years ago, ancient Egyptians were using marijuana to treat everything from sore eyes to hemorrhoids. Chinese culture has recognized marijuana's medicinal properties for thousands of years, and it remains one of the fifty fundamental herbs used in traditional Chinese medicine.[9]

Yet, history is replete with folk remedies that scientific study has ultimately proven to be ineffective or even harmful. For instance, barely a century has passed since heavily toxic mercury compounds were routinely relied upon for the treatment of syphilis and other ailments. We now know that mercury did nothing to cure syphilis or alleviate its symptoms. The ill-conceived treatment instead may have led to countless cases of mercury poisoning (which was often indistinguishable from the disease being treated). Mercury is known to have some antiseptic properties, and that attribute likely led to mercury and related compounds being used as common ingredients in numerous elixirs and potions offered to treat every ailment known to man,[10] despite the highly toxic nature of the ingredients.[11] Unfortunately, it was not until the advent of antibiotics (revolutionizing the treatment of syphilis) that the use of mercury as medicine fell into disfavor.

The use of butter as treatment for burns is another illustrative example. While not intrinsically toxic like mercury, butter turned out to be a counterproductive home remedy for the treatment of burns. The American Red Cross now discourages the treatment because butter can actually lead to trapping the heat of a burn, which in turn can lead to an increased risk of infection as well as inhibiting future treatment of the injury.[12] The immediate, soothing effect caused by the application of butter to a burn may have spawned its use as a burn remedy, but science has since proven the treatment to have a harmful net effect.

dents favored "their state allowing the sale and use of marijuana for medical purposes if it is prescribed by a doctor, while 23% are opposed." http://www.people-press.org/2010/04/01/public-support-for-legalizing-medical-marijuana/

8. See Controlled Substances Act, 21 U.S.C. § 812(c) (2006).

9. A recent article in Time magazine offered a short summary of the use of marijuana as medicine by ancient peoples:

As early as 2737 B.C., the mystical Emperor Shen Neng of China was prescribing marijuana tea for the treatment of gout, rheumatism, malaria and, oddly enough, poor memory. The drug's popularity as a medicine spread throughout Asia, the Middle East and down the eastern coast of Africa, and certain Hindu sects in India used marijuana for religious purposes and stress relief. Ancient physicians prescribed marijuana for everything from pain relief to earache to childbirth. Doctors also warned against overuse of marijuana, believing that too much consumption caused impotence, blindness and "seeing devils."

Stack & Suddath, *A Brief History of Medical Marijuana*, Time, 10/21/09, http://www.time.com/time/health/article/0,8599,1931247,00.html.

10. For example, "[b]lue mass, a pill or syrup in which mercury is the main ingredient, was prescribed throughout the 19th century for numerous conditions including constipation, depression, child-bearing and toothaches." http://en.wikipedia.org/wiki/Mercury_(element).

11. *See* http://en.wikipedia.org/wiki/Mercury_poisoning.

12. http://www.redcross.org/email/safetynet/v1n9/firstaid.asp.

Medical authorities have not arrived at any discernible consensus on the subject of marijuana as medicine, although individual studies have supported the conclusion that marijuana is useful in the treatment of a variety of disorders and ailments.[13] A long-standing criticism of marijuana as medicine, apart from the objections that stem from its widespread use as a recreational drug, is directed at the method of delivery. Marijuana has been traditionally administered by means of smoking, which can have immediate and obvious effects on those sensitive to smoke, as well as both subtle and severe long-term negative effects. While the body of research studying the health consequences of marijuana usage is perceptibly small in comparison to the research available regarding smoking tobacco, there appears to be little doubt that smoking marijuana has both respiratory and immunologic consequences.[14] Medical marijuana advocates counter these arguments by noting that less dangerous means of administering the substance exist, as marijuana can be prepared as tea or as an ingredient in food products.

Still, some studies suggest there are increased risks of cancer from marijuana usage unrelated to the method of delivery. A recent study found that men who use marijuana recreationally are twice as likely to be diagnosed with a particular sub-type of testicular cancer, nonseminoma.[15] On the other hand, at least one study found that "THC and other marijuana-derived compounds, known as 'cannabinoids,' are effective not only for cancer-symptom management (nausea, pain, loss of appetite, fatigue), they also confer a direct anti-tumoral effect."[16] Thus, when it comes to the question of whether marijuana has some potential medical benefits, there appears to be little dispute: it does. The most important question, however, and the one for which the proverbial jury is still out, is whether the advantages of marijuana as medicine, independent of the means of delivery, outweigh the negative side-effects associated with the substance. There is obviously room for additional study on both ends of that equation before we can expect any discernible consensus within the scientific community.[17]

13. Marijuana has been found to have established effects in the treatment of nausea, vomiting, premenstrual syndrome, unintentional weight loss, insomnia, and lack of appetite. Grotenhermen, Franjo, *Cannabis and Cannabinoids: Pharmacology, Toxicology and Therapeutic Potential* 124 (2002). Relatively well-confirmed effects were also found for the treatment of "spasticity, painful conditions, especially neurogenic pain, movement disorders, asthma, [and] glaucoma". *Id.*

14. Tashkin, Baldwin, Sarafian, Dubinett, Roth, *Respiratory and immunologic consequences of marijuana smoking*, The Journal of Clinical Pharmacology, abstract found at: http://jcp.sagepub.com/content/42/11_suppl/71S.short

15. http://www.reuters.com/article/2012/09/11/us-marijuana-cancer-idUSBRE88A03720120911.

16. http://www.thedailybeast.com/articles/2012/09/06/marijuana-fights-cancer-and-helps-manage-side-effects-researchers-find.html.

17. Individual studies aside, the American Medical Association and other prominent medical associations, including the American College of Physicians and the Leukemia & Lymphoma Society, have recommended further study of marijuana's potential medical benefits, but do not in any way endorse the use of marijuana as medicine at this time. Some medical organizations, including the American Society of Addiction Medicine, oppose the use of marijuana as medicine outright. In 1999, the National Institute of Health concluded that smoking cannabis is not recommended for the treatment of any disease or condition; however, the study did conclude that nausea, appetite loss, pain, and anxiety were conditions that could be mitigated by marijuana usage.

■ Turning back to the statute at hand, it would be extremely difficult to conclude that there is "no currently accepted medical use in the United States" for marijuana. 35 P.S. § 780–104. In certain regions of the United States, marijuana is prescribed as medicine to alleviate the symptoms attendant to numerous illnesses and ailments with the explicit approval (and occasional assistance) of state authorities. In other parts of the United States, including our Commonwealth, marijuana is not recognized as medicine for any purpose, despite the existence of pending legislation seeking to disrupt that paradigm.

Nonetheless, recognition that there is at least some acceptance of marijuana as medicine in the United States does not, *ipso facto*, excise marijuana from the list of Schedule I substances enumerated in 35 P.S. § 780–104. Consistent with our obligation to effectuate the intent of the legislature and give full effect to each provision of the statute, we instead conclude that Appellant's strained interpretation of 35 P.S. § 780–104 is itself the genesis of Appellant's due process concerns, not the plain language of the statute. A narrow and fair reading of the plain language of the statute alleviates any of Appellant's due process concerns.

The first sentence of 35 P.S. § 780–104 reads: "[i]n determining that a substance comes within this schedule, the secretary shall find: a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision." Standing alone, the phrase "comes within this schedule" might be interpreted to establish that all Schedule I substances must continuously meet the subsequently listed conditions

regarding potential for abuse and current medical use in order to retain their 'status' as a Schedule I substance. Alternatively, however, this provision can be read to mean that the conditions set forth in 35 P.S. § 780–104(1) apply only to future additions to Schedule I by "the secretary" who "shall find" that the substance under consideration meets those conditions prior to its addition to Schedule I. This latter interpretation is buttressed by the subsequent sentence, which reads: "[t]he following controlled substances are included in this schedule: . . . ." The second sentence of 35 P.S. § 780–104(1) is most logically read to act independently of the first, establishing a list of Schedule I controlled substances that are not dependent on the criteria set forth allowing additions to Schedule I by "the secretary" that is set forth in the first sentence. Thus, the listed substances *"are included in"* the schedule, regardless of the preceding language dealing with the conditions to be met for additions to the schedule. *Id.* (emphasis added).

Appellant's interpretation would require that each of the Schedule I substances listed under 35 P.S. § 780–104(1) continuously meet the conditions that there be "a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision." *Id.* Apart from the fact that it is not a rational reading of the plain text, that interpretation is perceptibly untenable with respect to many of the substances listed under the statute. For instance, heroin,[18] listed as a Schedule I substance under 35 P.S. § 780–104(1)(ii)(10), is incredibly effective in the treatment of severe pain associated with heart attacks, severe physical injury, and

---

**18.** "Heroin" is a term used for "diacetylmorphine" when that substance is used as a street drug.

certain terminal illnesses.[19] This is true of many of the opiates and opiate derivatives also listed under 35 P.S. § 780–104(1)(i) and (ii) as Schedule I substances. The inclusion of heroin as a Schedule I substance under Federal Law is the reason it lacks an accepted medical use in the United States.[20]

It is clear that a narrow reading of the express and plain meaning of the statute indicates that there is no requirement that the Schedule I substances listed under 35 P.S. § 780–104 continuously conform to the standard that there be "a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision." 35 P.S. § 780–104(1). Accordingly, we reject Appellant's suggested interpretation and conclude that his due process claim lacks merit. Regardless of whether there are accepted medical uses for marijuana in the United States, marijuana remains a Schedule I substance under the Drug Act.

 Appellant next contends that the trial court abused its discretion in denying the motion to suppress the seized contraband. Appellant argues the police lacked the requisite exigent circumstances justifying an intrusion into his home without a warrant. The trial court denied the motion on the basis that the intrusion was justified in order to secure evidence the police believed might be destroyed before they could obtain a warrant. Our stan-

dard of review of a trial court's denial of a suppression motion is well-settled:

> "Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.... [W]e must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1134 (Pa.2007), *cert. denied*, 552 U.S. 894, 128 S.Ct. 211, 169 L.Ed.2d 158 (2007). Those properly supported facts are binding upon us and we "may reverse only if the legal conclusions drawn therefrom are in error." *Id.*

*Commonwealth v. Dixon*, 997 A.2d 368, 372–73 (Pa.Super.2010) *appeal denied*, 611 Pa. 654, 26 A.3d 482 (2011) (quoting *Commonwealth v. Thompson*, 604 Pa. 198, 985 A.2d 928, 931 (2009)).

First to testify at the suppression hearing for the Commonwealth was Jeffrey DeSimone, Chief of the Homestead Borough Police Department. Chief DeSimone had twenty-one years of police experience including six years as Chief of Police with the Homestead Borough. Chief DeSimone had extensive experience in drug interdiction; he served for eight years as a canine officer with his department. As is evident from the facts of this case, he continued to

---

**19.** Indeed, in the United Kingdom and other European countries, diacetylmorphine is still used to treat severe pain under strict medical supervision.

**20.** Ultimately, our Commonwealth may criminalize the possession, manufacture, and distribution of marijuana and other intoxicating substances, independent of their medical utility, as a function of the police power, and the reasonableness of such measures is largely at the discretion of the legislature. However,

the police power is not unlimited. *See Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47, 49 (1980). Apart from such limitations, however, it is primarily for the citizens of Pennsylvania to decide, through their elected representatives, if the moral prerogatives of the citizenry justify the staggering social and economic costs of enforcing the prohibition on the medical and recreational use of marijuana.

be active in making narcotics arrests as Chief of Police. Chief DeSimone also said that he had experience in working with informants.

In April of 2010, Chief DeSimone received information from a police officer from a neighboring police department that large quantities of marijuana were being distributed from a house at 314 West 12th Avenue in the Borough of Homestead. The unnamed police officer informed DeSimone that there were numerous people carrying book bags, purportedly containing marijuana, coming and going from the residence.

Chief DeSimone relayed this information to his officers on the street. He then made a phone call to an informant to confirm the suspicions relayed by the neighboring police department. Regarding the informant's reliability, DeSimone stated: "I'm not going to say that they [sic] are a reliable confidential informant. I'm just going to call them [sic] an informant at this time, because I could not verify the reliability." N.T., 5/23/11, at 6. Upon further questioning, DeSimone stated that he found prior information obtained from the informant concerning criminal activity to be accurate. However, when asked if any prior information from the informant had resulted "in arrests or seizures of drugs[,]" Chief DeSimone replied "[a]t that time, no. It led more to surveillance activities . . . ." *Id.* at 7. Those surveillance activities, he indicated, did ultimately reveal drug activity. During cross-examination, however,

DeSimone agreed that the informant's information was unreliable, because the informant was "unproven." *Id.* at 20. He also agreed that the informant's information was the functional equivalent of a guess that criminal activity was going on at 314 West 12th Avenue. DeSimone could not, or would not, provide any specific prior instance in which the informant's shared information turned out to be correct or otherwise led to an arrest.

Reliability aside, the informant confirmed to Chief DeSimone the information conveyed by the unnamed police officer. Additionally, the informant indicated that the drug activity at 314 West 12th Avenue had been going on for some time. He also indicated during the phone call that two black males were currently transporting marijuana from the house and he gave a description of their car. DeSimone also indicated that the informant told him that there were two individuals in the house at 314 West 12th Avenue.[21]

Chief DeSimone communicated the car's description to Officer Fusco. Soon thereafter, Fusco initiated a traffic stop on the suspect vehicle a few blocks away from 314 West 12th Avenue. The traffic stop culminated in an arrest during which thirteen pounds of marijuana and a firearm were seized from the occupants of the vehicle.

The arrestees were transported to the Homestead Police Department. One of those individuals, Mr. Knight, after being mirandized, gave a brief oral statement to DeSimone. Knight refused to give a writ-

21. DeSimone never conducted any surveillance of the house to confirm the informant's claim that there was more than one occupant at 314 West 12th Avenue. By chance, DeSimone did have a casual conversation with Appellant a few days prior to the events in this case, at which time Appellant revealed to DeSimone that he lived at 314 West 12th Avenue. The Chief gave no indication that the conversation had revealed that anyone other than Appellant resided there. The informant did not tell DeSimone why or how he knew that a second person was present in the house. DeSimone assumed that the informant had directly observed a second person in or entering the house, and it is not clear from the record if that second person could have been one of the two males that had purportedly just been at the house to obtain marijuana.

ten statement. Knight told DeSimone "you know where I got the marijuana ... you know, up on the hill, at the little house." *Id.* at 10. Chief DeSimone stated that "[b]ased upon what the investigation was aimed at, I drew the conclusion that the house he was talking about was the house we ultimately ended up [at] afterwards." *Id.*

Chief DeSimone stated that *because* he could not get Knight to commit his statement to paper, evidence he would have used to obtain a search warrant, he "felt we had to get up there, [and] possibly do a knock and talk." [22] *Id.* at 11. Chief DeSimone, Officer Fusco, and Munhall officers Caterino and Trout then went to 314 West 12th Avenue. At some point in time after the traffic stop and before their arrival at the house, Fusco informed DeSimone that there was a possibility that an associate of Appellant had observed the traffic stop, and may have "alerted the occupants of 314 West 12th" Avenue. *Id.* at 15.

Officer Fusco approached the home from the rear alley as DeSimone and the Munhall officers approached the front door. DeSimone indicated that as he approached the home, "the odor of raw marijuana was prevalent. And the closer we drew to the house, the stronger the odor got." *Id.* at 11. DeSimone believed the odor was emanating from an open window near the front door.

Chief DeSimone knocked on the door, receiving no response. He knocked again, following which he heard the sound of "slight movement." *Id.* at 12. Still, no one answered the door. DeSimone then knocked a third time and announced, "police, please open the door[,]" at which time "the movement got more profound." *Id.* DeSimone stated: "[a]t that point in time,

with the loud movement, having the information that narcotics was [sic] involved, two suspects on the inside, we had no idea what at this point was transpiring on the other side of that door, really." *Id.* at 12–13.

Simultaneously, Fusco radioed from the back of the house. DeSimone described the transmission as "excited" but "garbled." *Id.* at 13. DeSimone did not understand what was being said. Fusco radioed DeSimone again, saying that there was some activity involving a person opening a window and jumping out at the rear of the residence.

At this time, Chief DeSimone kicked the door open and entered the home. He stated his reasoning for doing so as follows:

At that point in time I had no idea what was going on. Knowing that—having information that two people are inside, we were unaware if they were destroying evidence, if they were possibly trying to get a weapon. At that point in time I made a forced entry. I kicked the door open.

. . .

Well, as I said, we heard the scuffle, the hurried sounds louder, we know it's narcotics-related. The potential existed for the destruction of evidence, contraband, but, also, anytime you're dealing with narcotics, the narcotics and weapons go hand in hand. We've already announced that we're police, please open the door. Most normal people would open the door, come and see what the problem was.

I could only wonder are the people on the other side of the door destroying evidence, are the people on the other

<hr>

22. DeSimone later expounded that he did not believe he had probable cause to obtain a search warrant given the information he had

after speaking with Knight, which is why he decided to conduct a 'knock and talk' at Appellant's home. *Id.* at 31.

side of the door possibly arming themselves to use against us.

*Id.* at 14–17.

When Chief DeSimone entered the residence, he discovered that Appellant had jumped out the rear window, injuring himself, and had been detained by Officer Fusco in the rear alley. No one was found inside the house. While searching for the nonexistent second individual, DeSimone observed the butts of two handguns, an AK–47 magazine, and marijuana in plain view on a table. DeSimone and the other officers secured the residence while they obtained a search warrant. Once the search warrant was obtained, the officers conducted a thorough search of the house, discovering several firearms and approximately ten pounds of marijuana.

Munhall Officer Trout also testified at the suppression hearing. Trout was present with Chief DeSimone and Officer Caterino on the front porch during the "knock and talk." Trout recalled DeSimone knocking on the door when the radio transmission from Fusco came through. Unlike DeSimone, Trout did hear the first transmission from Fusco clearly. He heard Fusco say that someone had jumped out the rear window of the residence. DeSimone ordered Trout to go the rear of the house and assist Officer Fusco, and Trout complied with that order. When Trout left the front of the home to assist Fusco, DeSimone had not yet kicked open the front door.

Officer Fusco also testified. He affirmed that he went to the rear of 314 West 12th Avenue as ordered by DeSimone. A few seconds after he heard DeSimone knocking at the front door, he observed Appellant free fall from a second story window of the house, landing right at Fusco's feet. Fusco first radioed for medics, seeing that Appellant had landed "essentially on the front of his face" and had also sustained an injury to his left arm. N.T., 8/4/11, 10. Fusco opined that the garbled message heard by DeSimone was the initial call he made to get medical assistance for Appellant. Soon thereafter, he saw Officer Trout come around the building to assist him.

Appellant testified that on the day in question, the only other person who had been present in his home was "Mr. Knight." [23] *Id.* at 15. He said he heard the police knocking at his door and that he was, at first, unsure about what he was going to do. After a brief moment, he retrieved two pistols and placed them under a mattress, the same location where the AK–47 and its ammunition magazine was located. [24] Appellant stated that he was trying to conceal the weapons from view in the event the police came into his home. Immediately after hiding the firearm, Appellant jumped out the rear window "to evade the situation." *Id.* at 17. He stated that the police had not yet kicked in the front door at the moment he leapt from the window.

The Fourth Amendment provides that:

---

**23.** There appears to be little doubt that "Mr. Knight" is the same person referred to by Chief DeSimone as "Mr. Knighten," the man who was stopped and arrested by police and later questioned at the police station by DeSimone.

**24.** This is in obvious contention with Chief DeSimone's testimony that the butts of the handguns and the magazine were openly visible when he was searching for a second person in the house. Consistent with our standard of review, we assume the accuracy of DeSimone's account. Nonetheless, this factual dispute is irrelevant to the question of whether there were exigent circumstances justifying the warrantless entry into Appellant's home.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). Accordingly, the Supreme Court of the United States has long recognized that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 749, 104 S.Ct. 2091 (quoting *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).

██ Accordingly, "[a]bsent probable cause and exigent circumstances, the entry of a home without a warrant is prohibited under the Fourth Amendment." *Commonwealth v. Roland,* 535 Pa. 595, 637 A.2d 269, 270 (1994). In determining whether exigent circumstances exist, the following factors are to be considered:

(1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in de-

termining whether the warrantless intrusion was justified.

*Id.* at 270–71 (quoting *Commonwealth v. Wagner,* 486 Pa. 548, 406 A.2d 1026, 1031 (1979)). We may also consider "whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or a danger to police or other persons inside or outside the dwelling." *Id.* at 271. When considering these factors, we must remain cognizant that "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Id.* (quoting *Welsh,* 466 U.S. at 749–50, 104 S.Ct. 2091).

In its opinion, the suppression court determined that:

Based on the evidence introduced at the suppression hearings, exigent circumstances existed to justify the police's entry into the Defendant's residence. The police had reliable information that marijuana was being distributed from the residence. When the police arrived at the house to see if they could speak to the occupants, the officer smelled the strong odor of raw marijuana. When they knocked and announced, the police could hear from inside the house loud and hurried movement. Then the Defendant jumped out of a window. With the police fearing that evidence was being destroyed or that suspects were escaping, they decided to make a forced entry. Of note is the fact that no evidence was seized from the residence until a search warrant was obtained and properly executed. Thus, the Court did not make an error in denying the Defendant's motion to suppress.

Trial Court Opinion (TCO), 12/14/2011, at 4.

Appellant contends that the police fell far short of establishing the existence of

sufficient exigent circumstances to overcome the presumptive unreasonableness of the police intrusion. Appellant argues that while there may have been evidence that marijuana was being distributed from Appellant's residence, evidence buttressed by the smell of marijuana discovered emanating from the house, such evidence tends to support a finding of probable cause but does nothing to establish or support a finding of exigency. Furthermore, Chief DeSimone's fear of a second occupant destroying evidence was based upon information garnered from an informant that the Chief refused to identify as being reliable, but instead described as "unproven." N.T., 5/23/11, at 20.

The Commonwealth argues that "exigency arose with regard to the possibility that Appellant and/or other persons inside the residence would destroy incriminating evidence." Commonwealth's Brief, at 23. The Commonwealth contends that a finding of exigency in this case is concordant with this Court's findings of exigency in *Commonwealth v. Walker*, 836 A.2d 978 (Pa.Super.2003), *Commonwealth v. Bostick*, 958 A.2d 543 (Pa.Super.2008), and *Commonwealth v. Griffin*, 785 A.2d 501 (Pa.Super.2001). Accordingly, we review those decisions for comparison with the instant case.

In *Griffin*, Police arrested the appellant (Griffin) for selling crack cocaine to an undercover officer. The Philadelphia Police, while conducting drug surveillance, observed several individuals engage in apparent drug transactions on a street in Philadelphia. The undercover officer asked one the individuals, Simmons, for a quarter ounce of crack cocaine. Simmons went into a nearby house and came out again with Griffin and another man, Thomas. Griffin left in a vehicle with Thomas, returned shortly thereafter, and was observed handing Simmons a baggie. Simmons gave the baggie to the undercover officer in exchange for $225 in cash. Simmons was then seen giving the cash to Thomas, who was standing next to Griffin.

The undercover officer radioed for backup, and shortly thereafter two police officers arrived at the scene. Thomas and Griffin saw the police approach and quickly retreated into the house. During the retreat, the police observed Griffin handling a firearm. When the police arrived at the doorstep, they could see Griffin, through a window, secreting the firearm beneath a cushion. Police immediately entered the residence without a warrant, arresting Griffin and securing the firearm.

In *Griffin*, the appellant challenged the legality of the warrantless entry that occurred. We first found that police had "ample information amounting to probable cause" and that there was drug-related activity at the house that "was felonious in nature." *Id.* at 506.

> Moreover, [a]ppellant immediately withdrew indoors upon police arrival and displayed a handgun during his retreat. Thus, *it is significant that it was [a]ppellant who necessitated a pursuit* to prevent the potential destruction of evidence related to the suspected drug distribution and who made the prospect of securing the house pending a warrant too dangerous given the cover that nightfall could have given the armed conspirators.

> We find it additionally noteworthy that the officers were restrained in their pursuit by knocking and announcing their presence at the front door, entering only when clearly seeing that [a]ppellant, preoccupied with hiding his gun, would not admit them. Accordingly, we conclude that exigent circumstances prompted immediate police action and necessitated the officers' entry into the

premises to arrest [the] [a]ppellant and Thomas.

*Id.* (footnote omitted, emphasis added).

Thus, in *Griffin,* police directly observed the underlying illegal activity, sought to effectuate an arrest, but were thwarted when the suspects retreated into a home. Further observations established that the suspects, who had just evaded police, were armed and were witnessed attempting to secrete evidence. Exigent circumstances were found to exist justifying a warrantless entry for the purpose of securing the suspects and the observed firearm while a warrant was obtained.

In *Walker,* a police officer received a radio call that drug activity was occurring at a motel, a location familiar to the officer due to prior drug investigations there that had resulted in arrests. Upon his arrival at the motel, the officer observed the appellant (Walker) smoking from what was instantly identifiable as a glass crack pipe. Walker made eye contact with the officer, turned around, entered a motel room, and then closed the door. The officer exited his vehicle and followed Walker into the motel room. Once inside, the officer saw Walker attempt to hide the crack pipe in a drawer. Walker was arrested and found to be in possession of more than 24 grams of crack cocaine.

In justifying finding exigency in *Walker,* a panel of this Court explained:

Although Officer White had no reason to believe that [a]ppellant was armed, would be a danger to the officer or others, or might easily escape, other factors weigh heavily in favor of a finding of exigent circumstances. First, [a]ppellant was suspected of possession of narcotics and paraphernalia, both serious offenses. As discussed *supra,* there was more than a clear showing of probable cause, and no question that [a]ppellant would be in the motel room, as the officer personally saw him enter it. The time of entry was mid-morning, not at night, "which is a particularly suspect time for searches to be conducted." *Roland, supra* at 271. Moreover, the officer's entry was peaceable. Although the door was closed, it was not latched; Officer White testified that it was "[j]ust a matter of pushing the weight of the door." Finally, because drugs and crack pipes may be easily disposed, there was a strong likelihood here that evidence would be destroyed. Immediately after seeing the officer approach, and while holding a crack pipe in plain view, [a]ppellant turned, reentered the room, and closed the door. It was certainly reasonable for the officer to determine that [a]ppellant might destroy any narcotics and paraphernalia stored in that room.

*Id.* at 981 (some internal citations omitted).

Finally, in *Bostick,* police conducting plainclothes surveillance observed several apparent hand-to-hand narcotics transactions occurring on the street just outside of the subsequently targeted house. Following each observed transaction, police stopped the suspected recipient of narcotics a few blocks away, ultimately finding on those persons packets of heroin labeled with a particular brand name. At one point, the appellant (Bostick) exited the house and also engaged in suspected hand-to-hand narcotics transactions. When each recipient was subsequently stopped, police recovered the same 'brand' of heroin they had observed earlier. This same sequence of events was repeated several times. During the course of these transactions, Bostick would approach a vehicle located near the house, access the center console, return into the house, and then reemerge prior to completing a transaction.

At some point, Bostick became aware of the police presence and attempted to flee,

but he was quickly apprehended. Bostick was carrying more than $700. Shortly thereafter, a man exited the house, and upon seeing the police outside, he dropped some items in the vestibule and ran back inside. The police followed and arrested the man, after finding marijuana on the vestibule floor. The police then searched the house to prevent the possibility that evidence would be destroyed. While inside the house, they observed several of the branded heroin packets in plain view.

In *Bostick*, we held that exigency existed, largely relying on *Walker*, because:

> When Mr. Sanders unexpectedly, and without any prompting by police, opened the door at the target property, 3018 N. 8th Street, he became aware that police were outside. Combined with the fact that he said "oh shit" when he saw the police and made furtive movements behind the door as if he were tossing objects to conceal them, along with the probability gained from surveillance that the house contained a stash of drugs, police could reasonably conclude that an exigency arose with regard to the possibility that Mr. Sanders and/or other persons inside the residence would destroy incriminating evidence.

*Id.* at 558.

A common circumstance in *Bostick*, *Griffin*, and *Walker* was that police directly observed illegal activity within the immediate vicinity of the residence that was subsequently searched, and those observations were made immediately prior to the warrantless entry. Also common to each of those cases was the fact that a suspect had spotted and then immediately attempted to evade police by fleeing into a residence, creating an immediate risk that an attempt to destroy evidence was impending. Another commonality was that police had not created the exigency justifying the warrantless entry. These circum-

stances are conspicuously absent in the instant case. "It is well established that police cannot rely upon exigent circumstances to justify a warrantless entry where the exigency derives from their own actions." *Commonwealth v. Demshock*, 854 A.2d 553, 557 (Pa.Super.2004).

In *Demshock*, we rejected the Commonwealth's claim of exigency because it had been manufactured by the police. In that case, police were patrolling an apartment complex that had been subjected to several bouts of theft and vandalism. While walking down a walkway between apartments, a police officer observed what he believed to be teenagers consuming beer inside one of the apartments. He made the observation through a sliding glass door. The officer called for backup, and the residence was soon surrounded by police.

Police knocked on the door, and someone responded, "who is there?" An officer responded, "hey man, it is me." Someone then opened the door partway and peered out. After observing the police officer, the person backed away from the door, and the police followed him inside, pushing the door open as they entered. The police observed that the odor of marijuana was detectable as soon as the door was opened.

Once inside, the police observed marijuana in plain view on a table. The officer asked for identification from the partygoers, and told the crowd that if they had marijuana on them, they should place it on the table. The appellant then pulled a bag of marijuana out of his pocket and placed it on the table. In rejecting the Commonwealth's claim that exigent circumstances excused the warrantless entry that occurred in *Demshock*, we concluded that "if there were an exigency, it was created by the officers' choice to attempt a warrantless entry rather than taking steps to secure a search warrant." *Id.* at 559.

With these cases in mind, we consider the facts of the instant case in light of the factors set forth in *Roland* to determine if sufficient exigent circumstances were present as to permit the warrantless entry into Appellant's home. While the distribution of large quantities of marijuana is a serious offense, the instant case did not present a situation where a warrantless entry was necessary to prevent or stop an immediate threat of violence. Police were also not in hot pursuit of a felon whose felonious conduct had been directly observed by police. Furthermore, Appellant did not flee from police into the residence in response to spotting the police, as was the case in *Bostick, Griffin*, and *Walker*. Instead, and similar to the case in *Demshock*, Appellant appeared to be unaware that the police were investigating until they arrived at his home to conduct a 'knock and talk.'

Chief DeSimone and the other police officers lacked any specific evidence that anyone inside the home was armed. Rather, DeSimone's suspicion that firearms or other weapons might be found within the home was premised upon generalized experience with those that traffic in narcotics, not any particular evidence derived from the investigation in this case. In contrast, in *Griffin*, police directly observed a firearm. In this case, DeSimone was only speculating regarding the presence of firearms.[25]

Chief DeSimone indicated that the reason he approached Appellant's home to conduct a 'knock and talk' was precisely because he felt that the investigation had yet to arrive at sufficient probable cause to allow him to obtain a search warrant. While DeSimone's subjective belief at that time is not dispositive as to the question of whether probable cause existed, it was,

even if incorrect, a prudent disposition at the time. As DeSimone acknowledged, the evidence compiled prior to the decision to conduct a 'knock and talk' consisted of speculation by an unnamed officer, reinforced by an unproven informant, and the statement of Mr. Knight, who was unwilling to commit his admission to writing. The police never directly observed any transactions, nor did they have any other strong evidence that marijuana was being distributed from 314 West 12th Avenue. Nonetheless, the confluence of circumstances establishing probable cause to search the residence was mounting.

The evidence certainly surpassed the threshold necessary to establish probable cause after DeSimone detected the smell of marijuana emanating from Appellant's house. DeSimone testified that the odor of marijuana was noticeable long before he arrived at the front door. In fact, he stated that he detected the odor halfway down the walkway leading from the street to the front porch of the house. N.T., 5/23/11, at 11, 32. Once the odor of marijuana was detected emanating from the residence, the threshold necessary to establish probable cause to obtain a search warrant was met, but to say that the factors establishing probable cause were overwhelming would be an exaggeration.

Once Appellant dove out of the window, the police could only speculate as to whether anyone else remained in the residence. As Chief DeSimone admitted, he did not conduct any surveillance on 314 West 12th Avenue to determine if anyone other than Appellant resided there. The only evidence that another person might be present was information garnered from the unproven informant. Nothing was ob-

---

25. The "guns follow drugs" presumption has been criticized in *Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153, 1162 (2000) and

*Commonwealth v. Grahame*, 607 Pa. 389, 7 A.3d 810, 816 (2010).

served at the scene by the police, either before or after Appellant's unorthodox exit, to indicate that a second person was present in the home.

DeSimone could not say how the informant arrived at the conclusion that anyone other than Appellant was in the house. The informant only told DeSimone about "a person who had gone into the house earlier." N.T., 5/23/11, at 24. DeSimone did not know how much time had transpired between the informant's observation and DeSimone's arrival at the home. DeSimone also admitted that the informant may have been unable to see if anyone had exited from the rear of the house. It was also unknown whether the informant was referring to Mr. Knight when he told DeSimone that a second person had entered the house earlier in the day. In any event, at the time of the 'knock and talk', the house was surrounded by police, and Appellant's attempt at escape was an unmitigated failure. There was no evidence presented that there was any serious risk that a person remaining in the house could escape.

The risk that evidence would be destroyed is directly related to the possibility that a second person was in the house, and nothing occurred while police surrounded the home to indicate the presence of more than one individual inside. While the police heard hurried movement inside the house prior to Appellant's bizarre exit, there was nothing to indicate or suggest that evidence was being destroyed. Hurried movement does not provide a strong inference that evidence was being destroyed, and, in any event, nothing was heard after Appellant's exit from the house. Chief DeSimone's hasty entrance immediately thereafter prevented any further observations. Still, because the risk that evidence would be destroyed was the primary factor asserted by the Commonwealth to advance their claim of exigent circumstances, we will discuss this issue in more detail below.

The warrantless entry was not 'peaceable.' Chief DeSimone kicked in the front door to gain entry into the residence. Unfortunately, the record does not indicate at what time of day these events occurred. Although we are aware that several events transpired earlier in the day, we do not know when the series of events commenced. It appears that a search warrant was obtained quickly following the warrantless entry (a fact that might support the conclusion that the entry occurred in daylight, applying the presumption that it would be easier to find a magistrate to sign a warrant during the day). That same fact, however, also demonstrates that there is little reason to believe that it would have taken a significant amount of time to obtain a search warrant had one been sought prior to the 'knock and talk' attempt.[26]

Balancing all of these factors, we conclude that although probable cause existed at the time of the warrantless entry, the Commonwealth failed to demonstrate exigent circumstances sufficient enough to overcome the strong presumption that the warrantless invasion of Appellant's home was illegal. Contrary to the Commonwealth's arguments, the Bostick, Griffin, and Walker rulings fail to support a finding of exigency in these circumstances. Appellant was not directly observed by

---

**26.** At oral argument, the Commonwealth asserted that probable cause to search the home existed prior to when DeSimone smelled the marijuana outside the home, and that probable cause certainly existed after that observation was made. However, the Commonwealth could not offer a reason why the police did not attempt to obtain a search warrant either before or after the odor of marijuana was detected by DeSimone.

police engaging in felonious behavior, as was the case in *Bostick, Griffin,* and *Walker.* Though police suspected a drug distribution scheme operating out of 314 West 12th Avenue, they did not directly witness any suspected drug transactions as occurred in both *Bostick* and *Griffin,* nor did they observe felonious possession of narcotics as occurred in *Walker.*

Also common to *Bostick, Griffin,* and *Walker* were facts that the appellants in those cases had observed the presence of police and reacted by retreating into the residences that were ultimately searched. Their knowledge of the presence of police greatly elevated the risk that evidence would be destroyed if police were to wait to obtain a search warrant. These are facts conspicuously absent from *Demshock* and the instant case. Here, the risk that Appellant, or anyone else within the house, would destroy evidence was largely created by the police who approached a home that was the target of an investigation to do a 'knock and talk.' It is hard to envision a purpose for this particular 'knock and talk' other than an intent to manufacture exigency and bypass the warrant requirement.

As in *Demshock,* "[t]his was not a case where officers stumbled directly upon a crime in progress and had no time to secure a warrant." *Demshock,* 854 A.2d at 557. The police in this case approached a home that was the sole target of the criminal investigation they were conducting; they were not confronted with unforeseen circumstances requiring immediate action. Given that their suspicions of illegal activity within the house had developed over the course of the day, rather than mere minutes or seconds preceding the warrantless entry, the risk that there might be an attempt to flee or destroy evidence on the part of the occupant of the house should have been at the forefront of Chief DeSi-

mone's mind when he decided to conduct a 'knock and talk.'

The likelihood that Chief DeSimone, no amateur in the field of drug interdiction, simply failed to contemplate the likelihood that a 'knock and talk' would run the risk that the occupant or occupants would destroy evidence when confronted with the presence of police at the front door would have been quite an oversight for such a highly trained and experienced officer of the law. A far more reasonable interpretation was that this 'knock and talk' was conducted with the hope that events would transpire in such a fashion as to obviate the warrant requirement altogether. Not surprisingly, that is exactly what happened. However, if the "chief evil against which the wording of the Fourth Amendment is directed" can be so easily circumvented by design rather than circumstance, we would be forced to accept that the exception is permitted to swallow the rule. *See Welsh,* 466 U.S. at 748, 104 S.Ct. 2091. To prevent dilution of the sanctity of a citizen's home, the core element of the Fourth Amendment, we must remain vigilant against attempts by police to actively seek out exigency, no matter how well-intentioned their efforts might be.

Nevertheless, the probability that evidence would be destroyed in this case, independent of whether the exigency was manufactured, is exaggerated. Police suspected 314 West 12th Avenue to be the locus of distribution for significant quantities of marijuana. Large quantities of marijuana cannot be easily disposed of in the same manner as most other controlled substances. It does not take an expert to know that one cannot flush multiple pounds of marijuana down a toilet quickly, nor with the ease that one could flush heroin, cocaine, or other common controlled substances.[27] Furthermore, Chief

---

27. To illustrate this point, in Iowa City, a man

was apprehended following his attempt to

DeSimone, obviously adept at differentiating between the smells of raw and burned marijuana, could have quickly determined if there were significant quantities of marijuana being burned inside the home, particularly since windows at the house had been left open, permitting the odor of raw marijuana to exude from the residence in the first place. There simply was no serious risk that a substantial quantity of marijuana could be destroyed within the residence, while secured from the outside by police pending the arrival of a search warrant, without those surrounding the house becoming aware of such activities.

Furthermore, unlike what had occurred in *Bostick, Griffin,* and *Walker,* the reaction that occurred in response to the presence of police in this case occurred *after* the police knocked on the door. This strongly supports our conclusion that the exigency that occurred was created by police in this instance. Prior to when the police arrived at Appellant's door and announced their presence, there was no indication that there was an attempt to destroy evidence underway and, thus, no exigency. Thus, the exigency encountered by police was of their own making, a circumstance easily avoided had the police simply sought to acquire a search warrant.

Hence, we conclude that the risk that evidence would be destroyed was principally a manufactured exigent circumstance and also objectively unrealistic in the circumstances of this case. Both exigent circumstances and probable cause are required to justify a warrantless entry into a home. Lacking sufficient and valid exigent circumstances, the warrantless intrusion in this instance was conducted in contravention of the Fourth Amendment and was, therefore, illegal. Consequently, we conclude that the trial court abused its discretion in denying the motion to suppress the seized contraband.

Judgment of sentence reversed.

flush a mere 44 grams (less than 1/10 of one pound) of marijuana down a toilet. Even that relatively small amount caused his toilet to clog, thus allowing authorities to recover the contraband. http://thegazette.com/2010/05/09/police-man-tried-to-flush-marijuana-down-toilet/ We do not doubt that small quantities of marijuana can be flushed down an average toilet. However, the police in this case reasonably suspected (an accurate suspicion, in hindsight) that a far greater quantity of marijuana was present in the home in this case.