J-A35037-14

2015 PA Super 94

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DOMINICK WILLIAM HAYNES, | |
| Appellant | No. 353 WDA 2014 |

Appeal from the Judgment of Sentence October 4, 2013
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0001600-2012

BEFORE: BENDER, P.J.E., BOWES, and ALLEN, JJ.

OPINION BY BOWES, J.: **FILED APRIL 22, 2015**

Dominick William Haynes appeals from the judgment of sentence of twelve to thirty years incarceration after a jury found him guilty of four counts of possession with intent to deliver ("PWID"), two counts of corrupt organizations, and one count of criminal conspiracy and hindering apprehension. After careful review, we vacate the judgment of sentence and remand for resentencing. In all other respects, we affirm.

The relevant facts pertaining to Appellant's issues are as follows. Pennsylvania State Police conducted a warrantless entry into an apartment. Specifically, Trooper Jeffrey Brautigam was conducting surveillance on February 22, 2012, outside the Hawksworth Garden Apartments in Greensburg, Westmoreland County. Approximately one and one-half hour earlier, two other troopers had been surveilling the apartments and

witnessed drug sale activity. Those officers followed the buyer and performed a traffic stop. The driver was found with heroin and indicated that he bought the heroin from a woman at the Hawksworth apartments.

Trooper Brautigam, as part of his surveillance, observed a woman exit Building B of the apartments and meet a series of individuals in the parking lot. He indicated that he had seen hundreds of drug transactions transpire and described the woman's interactions with these individuals as drug transactions. Trooper Brautigam testified that the female, later identified as Kristin Weightman, would exit the apartment building and a car would pull into the parking lot. Weightman would then hand something to the driver or passenger and the passenger would hand something to her. The car would then leave, and Weightman would return to the building. This occurred three times.

At the time, Trooper Brautigam also had information that another individual, Chauncy "Gunner" Bray, was in the area with Weightman. Trooper Brautigam knew Bray from past encounters and was told that Bray may be in possession of a firearm. Trooper Edward Malloy witnessed which apartment Weightman entered and relayed that information to Trooper Brautigam. Trooper Brautigam and Trooper Malloy then watched Weightman meet a white male, later identified as Kurt McCamley, and return to the apartment building. Police intended to question Weightman before she entered the apartment, but were unable to intercept her. Trooper Brautigam

then elected to knock on the door to speak with Weightman. As the two officers approached, Trooper Brautigam smelled burning marijuana emanating from inside the apartment.

Trooper Brautigam knocked on the door and an individual asked who it was. He responded that he needed to speak to the renter and heard rumbling inside. He then identified himself as the police and asked that someone open the door. Those inside would not answer the door, and, according to Trooper Brautigam, they became quiet. After twenty to thirty seconds, the police kicked open the door. Entry occurred at approximately 12:30 in the afternoon. Bray attempted to flee and toss money away but was captured. Four other males were inside, including Appellant, as were Weightman and McCamley.[1] In plain view was a plastic bag with nine bricks of heroin, money on the sofa, and burnt marijuana blunts on a window sill. Thereafter, police secured a search warrant for the apartment and questioned those present. Appellant maintained that he was just visiting and that the drugs were not his. The heroin inside the apartment was confirmed to weigh 7.8 grams.

Appellant unsuccessfully litigated a suppression motion and proceeded to trial with one other individual, James Moore. A different judge presided

_____

[1] Trial testimony revealed that Appellant and Ms. Weightman arrived the night before and spent the night. The apartment was being rented by a Jillian Davis.

over the jury trial. As part of the investigation into the same drug ring, police, on the same day as the apartment raid, conducted a warrant-based search of another apartment rented by a Nicole Dudek. They recovered six bricks of heroin, suboxone, money, and cell phones. Police then called Dudek and informed her of their discovery. She did not turn herself in at that time and stayed with Moore for five days and Appellant for one night. Thereafter, she did turn herself in to the authorities. Additional testimony from several drug addicts indicated that Appellant was involved in the sale of heroin.

The jury found Appellant guilty of the aforementioned charges. The court sentenced Appellant to twelve to thirty years imprisonment, including a mandatory minimum sentence relative to the weight of the drugs involved. The jury was not instructed to make a finding regarding the weight of the drugs. Appellant filed a timely post-sentence motion, which the court denied. This appeal ensued. The trial court and Appellant complied with Rule 1925. Appellant raises four issues for this Court's review.

  I.    Whether the honorable trial court erred in failing to
        suppress the fruits of the raid on the Hawksworth Garden
        Apartments?

  II.   Whether the honorable trial court erred in failing to dismiss
        all of the charges filed against the Defendant as being the
        fruits of the illegal search and seizure at the Hawksworth
        Garden Apartments?

  III.  Whether the honorable trial court issued an illegal
        sentence by imposing a mandatory minimum sentence at
        count 16 whenever the predicate facts necessary for an

enhanced sentence were not submitted to the jury or found to exist beyond a reasonable doubt?

IV.    Whether the honorable trial court erred in failing to grant the motion for judgment of acquittal of the harboring a fugitive charge?

Appellant's brief at 6.

Appellant's first two claims pertain to the suppression of evidence. In evaluating a suppression ruling, we consider the evidence of the Commonwealth, as the prevailing party below, and any evidence of the defendant that is uncontradicted when examined in the context of the record. *Commonwealth v. Sanders*, 42 A.3d 325, 330 (Pa.Super. 2012). This Court is bound by the factual findings of the suppression court where the record supports those findings and may only reverse when the legal conclusions drawn from those facts are in error. *Id*.

Appellant argues that the warrantless search of the apartment violated both his Fourth Amendment and Article I, § 8 right to be free from unreasonable searches and seizures. However, his main focus is on the Pennsylvania Constitution. In this respect, he maintains that the Pennsylvania charter provides greater protections than the Fourth Amendment. In support, he relies on *Commonwealth v. Demshock*, 854 A.2d 553 (Pa.Super. 2004), and *Commonwealth v. Waddell*, 61 A.3d 198 (Pa.Super. 2012), and distinguishes the United States Supreme Court decision in *Kentucky v. King*, 131 S.Ct. 1849 (2011).

Ordinarily, law enforcement must obtain a warrant before conducting a search. ***Commonwealth v. Lagenella***, 83 A.3d 94, 102 (Pa. 2013). In this respect, warrantless searches are generally presumed unreasonable. ***Commonwealth v. Taylor***, 771 A.2d 1261, 1266 (Pa. 2001). Nonetheless, there are exceptions to the warrant requirement, including those situations where probable cause exists in conjunction with exigent circumstances. ***Commonwealth v. Petroll***, 738 A.2d 993, 999 (Pa. 1999).

In ***Demshock***, police received complaints of a car theft and vandalism in the area of an apartment complex. A detective was patrolling the area on foot as a result. While doing so, he walked past an apartment and observed through a one-foot vertical blind of a sliding door what appeared to be teenagers drinking beer. Based on this observation, he radioed other officers who were patrolling the complex. While covering the apartment's peep hole, the detective knocked on the door. A person inside asked who it was and the detective said, "hey man, it is me." ***Demshock***, ***supra*** at 554. An individual opened the door slightly and looked outside. Upon seeing that it was police, the person stepped back and police pushed the door open and entered. Police then saw marijuana in plain view.

The trial court denied a suppression motion, and Demshock was found guilty of possession of marijuana and underage drinking. This Court reversed on appeal, finding that the entry into the apartment violated the Fourth Amendment. We noted that the detective did not testify that he

entered the apartment to prevent the destruction of evidence. *See id*. at 556. The *Demshock* panel continued, "Here, the officers observed the illegal activity from outside the premises without the occupants detecting their presence. Under these circumstances, the officers could have made efforts to secure a search warrant and quite possibly could have secured a warrant prior to any of the partygoers realizing that the police were outside." *Id*. at 557. According to the *Demshock* Court, if an exigency existed therein, once police had probable cause, "police could simply knock upon the door rather than go through the trouble of obtaining a warrant." *Id*. at 558. It continued stating, "The Fourth Amendment could be made substantially impotent if this were the case." *Id*.

In *Waddell*, this Court, relying on *Demshock*, ruled that suppression was warranted on Fourth Amendment grounds where the police created their own exigency by knocking and announcing. The facts in *Waddell* are as follows. Police in Homestead, Allegheny County, received information from a neighboring police officer that large amounts of marijuana were being sold from a house at 314 West 12th Avenue. Homestead's Chief of Police contacted an informant who confirmed that the house was used to sell narcotics and maintained that there were two black males transporting marijuana from the house. The informant further provided a description of the car. Police stopped the car described by the informant several blocks from the house. Two individuals were arrested for being in possession of

thirteen pounds of marijuana. In addition, police located a firearm. One of those men indicated that he got the marijuana "up on the hill, at the little house." *Waddell*, *supra* at 209.

Homestead police and Munhall officers travelled to 314 West 12th Avenue. As they approached, a strong odor of marijuana was detected coming from the house. Police knocked on the door and, after hearing no response, discerned the sound of slight movement inside. Police knocked twice more, the final time stating that it was the police and asking someone to open the door. At that time, more movement was heard and another officer radioed that a person had jumped out of a window from the rear of the home. Based on the belief that someone inside might destroy evidence or retrieve a gun, police kicked in the door and entered the house. Two handguns, an AK-47 magazine, and marijuana were in plain view. Citing *Demshock*, the panel stated, "It is well established that police cannot rely upon exigent circumstances to justify a warrantless entry where the exigency derives from their own actions." *Waddell*, *supra* at 214. The *Waddell* panel added that, "Hurried movement does not provide a strong inference that evidence was being destroyed[.]" *Id*. at 216.

The court continued that it was reasonable to assume that the "'knock and talk' was conducted with the hope that events would transpire in such a fashion as to obviate the warrant requirement altogether." *Id*. at 217. It further reasoned, "To prevent dilution of the sanctity of a citizen's home, the

core element of the Fourth Amendment, we must remain vigilant against attempts by police to actively seek out exigency, no matter how well-intentioned their efforts might be." *Id*. The ***Waddell*** Court did not discuss ***King***, nor did the Commonwealth brief that case.

In ***King***, police set up a controlled buy of crack cocaine outside an apartment complex. An undercover officer watched the transaction occur and then radioed to uniformed officers to arrest the suspect. The officers were unable to stop the person before he entered an apartment. Unlike this case, police did not see which apartment the suspect entered, but heard a door close and detected a very strong odor of marijuana from one of two apartments in the vicinity. The suspect actually entered the apartment not at issue.[2] One officer knocked loudly and announced the presence of police at the apartment from which the marijuana smell was emanating. That officer maintained that he could hear the sound of things being moved inside. Therefore, he kicked down the door. Marijuana and powder cocaine were located in plain view.

_____

[2] At early American common law, this would have been an important distinction since warrantless entry was only permitted if the felon being pursued was actually inside the premises. ***See e.g.***, William Waller Hening, The New Virginia Justice, 303-304 (Richmond, 2nd ed. 1810) (citing Matthew Hale and Serjeant Hawkins, two of the most influential English legal treatise writers at the time of America's founding).

The Kentucky Supreme Court ruled that police improperly created their own exigency in violation of the Fourth Amendment. The United States Supreme Court granted *certiorari* to consider whether the exigent circumstance rule applies "when police, by knocking on the door of a residence and announcing their presence, cause the occupants to attempt to destroy evidence." ***King***, ***supra*** at 1854.

The ***King*** Court reasoned that a rule precluding police from making a warrantless entry to prevent destruction of evidence "would unreasonably shrink the reach of this well-established exception to the warrant requirement." ***Id***. at 1857. The Supreme Court discussed various state and federal approaches that precluded a finding of exigency under similar circumstances. With respect to cases concluding that police possessed probable cause and sufficient time to secure a warrant, it submitted that such an approach "unjustifiably interferes with legitimate law enforcement strategies." ***Id***. at 1860. The ***King*** Court found that, "Faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." ***Id***. at 1861. Thus, ***King*** held that the police, by knocking and announcing, did not impermissibly create the exigency needed for a warrantless search.

***King*** thus calls into question portions of ***Demshock*** and ***Waddell*** insofar as they rely on the Fourth Amendment and the now-overruled view

that under the Fourth Amendment the police cannot create their own exigency by knocking and announcing. For this reason, Appellant maintains that Pennsylvania constitutional principles should be applied more broadly.

As noted, Appellant's position is essentially that the police created their own exigent circumstances by knocking on the door of the apartment rather than securing a search warrant. He highlights that police knew that Weightman had sold drugs to one person one and one-half hour before entering the apartment. Appellant adds that Trooper Brautigam also saw Weightman engage in three separate drug sales and knew what apartment she was entering. Accordingly, Appellant posits that police had sufficient information to secure a warrant but elected to create their own exigency by approaching and knocking on the door.

The Commonwealth responds by arguing for the first time, though the issue is not waived, *see Commonwealth v. Hawkins*, 718 A.2d 265, 268 n.3 (Pa. 1998), that Appellant did not establish an expectation of privacy in the apartment. This argument fails in light of *Commonwealth v. Arnold*, 932 A.2d 143 (Pa.Super. 2006). Therein, this Court held that a visitor to an apartment has a reasonable expectation of privacy in the place being visited. We found that to hold otherwise "would permit police officers to provide retroactive justifications and randomly invade homes on the pretense that any person found not to be a non-resident after the fact could be searched." *Id*. at 149; *see also Minnesota v. Olson,* 495 U.S. 91, 98 (1990) ("We

think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.").

In the alternative, the Commonwealth contends that the police had both probable cause and exigent circumstances to enter the apartment. Accordingly, it maintains that the warrantless entry was lawful. Here, Appellant disputes only the exigent circumstances. The Commonwealth relies heavily on **King**, **supra**, and asserts that, after police knocked on the door, exigent circumstances arose because those inside refused to answer, movement was heard, and a powerful smell of marijuana was coming from the residence.

We begin by noting that in several contexts, the Pennsylvania Supreme Court has interpreted Article I, § 8 to afford broader protections than interpretations of the Fourth Amendment by the United States Supreme Court. **Theodore v. Delaware Valley School District**, 836 A.2d 76 (Pa. 2003) (finding Article I, § 8 provides greater protections for suspicion-less drug testing of students than does the United States Supreme Court's Fourth Amendment jurisprudence); **Commonwealth v. Matos**, 543 Pa. 449, 672 A.2d 769 (Pa. 1996) (rejecting the Supreme Court's decision in **California v. Hodari**, 499 U.S. 621 (1991), and holding that, under Article I, § 8, pursuit by a police officer without probable cause or reasonable suspicion constitutes a seizure); **Commonwealth v. Edmunds**, 586 A.2d 887 (Pa. 1991) (declining to adopt "good faith" exception to exclusionary rule under

*United States v. Leon*, 468 U.S. 897 (1984)); *Commonwealth v. Melilli*, 555 A.2d 1254 (Pa. 1989) (installation of pen register requires probable cause); *Commonwealth v. DeJohn*, 403 A.2d 1283 (Pa. 1979) (expectation of privacy exist in bank records); *Commonwealth v. Sell*, 470 A.2d 457 (Pa. 1983) (retaining automatic standing rule in Pennsylvania and declining to adopt *Rakas v. Illinois*, 439 U.S. 128 (1978); *United States v. Salvucci*, 448 U.S. 83 (1980)).

However, in other situations, our High Court has declined to interpret Article I, § 8 as providing greater protections than the United States Supreme Court's Fourth Amendment jurisprudence. *See Commonwealth v. Russo*, 934 A.2d 1199 (Pa. 2007) (open fields doctrine); *Commonwealth v. Duncan* 817 A.2d 455 (Pa. 2003) (no privacy right in name and address); *Commonwealth v. Glass*, 754 A.2d 655 (Pa. 2000) (anticipatory search warrants); *Commonwealth v. Waltson*, 724 A.2d 289 (Pa. 1998) (search warrant of house not overbroad); *Commonwealth v. Williams*, 692 A.2d 1031 (Pa. 1997) (search of parolee); *Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014) (plurality) (automobile searches).

We consider four factors in analyzing whether our state charter offers more protections than does the federal constitution as interpreted by the Supreme Court: (1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania case law; (3) related case law from other states; and (4) policy considerations, including unique

issues of state and local concern and applicability within modern Pennsylvania jurisprudence. *See Edmunds*, *supra* at 895.

In addition, when considering the Pennsylvania Constitution, "great regard should be paid to spirit and intention," and it is important to examine the "probable intent of the makers." *Commonwealth v. Rose*, 81 A.3d 123, 127 (Pa. Super. 2013), *allowance of appeal granted on other ground*, 95 A.3d 274 (Pa. 2014) (citing *Farmers' & Mechanics' Bank v. Smith*, 3 Serg. & Rawle 63, 1817 WL 1771, 5 (Pa. 1817), *reversed on other grounds* at 19 U.S. 131, 5 L. Ed. 224 (1821) (emphases omitted), and *Firing v. Kephart*, 466 Pa. 560, 353 A.2d 833, 835-836 (Pa. 1976)).

In performing this examination, we keep in mind that "[a] constitution is made, not particularly for the inspection of lawyers, but for the inspection of the million, that they may read and discern in it their rights and their duties; and it is consequently expressed in the terms that are most familiar to them." *Monongahela Navigation Co. v. Coons*, 6 Watts & Serg. 101, 114 (Pa. 1843). Thus, we construe words in their plain and natural meaning, unless the words themselves denote a technical sense. *Id*. "Concomitantly, a fundamental precept in interpreting our constitution is that the language 'must be interpreted in its popular sense, as understood by the people when they voted on its adoption. Our ultimate touchstone is the actual language of the Constitution itself.'" *Rose*, *supra* at 127 (quoting *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 939 (Pa. 2006)). In

short, we consider "the original public meaning of the text at issue, giving due regard to both its spirit and the intent of the framers of the clause." ***Rose***, ***supra*** at 127.

The current version of Article I, § 8 of the Pennsylvania Constitution provides,

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed by the affiant.

Pa.Const., Article I, § 8.  Similarly, the Fourth Amendment reads,

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S.Const. Am. IV.

The Fourth Amendment, proposed by Congress in 1789, was ratified December 15, 1791.  Of note, however, is that Pennsylvania's right against unlawful searches and seizures predates the ratification of the Fourth Amendment.  The Pennsylvania Constitution of 1776 set forth:

> That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not particularly described, are contrary to that right, and ought not to be granted.

- 15 -

Pa. Const., (1776) Chapt. 1, Article X.

This provision did not utilize the term "unreasonable" and focused on repudiating the issuance of general warrants. Accordingly, this provision was directly aimed at banning searches using general, *i.e.*, overbroad warrants. This, of course, is not surprising when considered in historical context.

John Dickinson, a prominent Pennsylvania revolutionary leader and signer of the federal constitution as a Delaware delegate, writing in his Letters of a Pennsylvania Farmer, complained of the 1767 Townshend Act's allowance of customs officers "'to enter into any house, warehouse, shop, cellar, or other place in the British colonies or plantations in America, to search for, or seize prohibited or unaccustomed goods,' . . . on 'writs granted by the inferior or supreme court of justice, having jurisdiction within such colony or plantation respectively.'" Letters of a Pennsylvania Farmer, Letter IX, 88-89 (reprinted Philadelphia, 1774).

He noted that he was "well aware that writs of this kind may be granted at home, under the seal of the court of exchequer: But I know also that the greatest asserters of the rights of Englishmen, have always strenuously contended, that such a power was dangerous to freedom, and expressly contrary to the common law, which ever regarded a man's house, as his castle, or a place of perfect security." **Id**. at 89; **see also Gary**,

*supra* at (Todd, J., dissenting) (discussing Dickinson and Pennsylvania opposition to such writs).

Even before Dickinson's well-known and widely disseminated "Letters" was the Writs of Assistance case, also commonly called Paxton's Case. The case was widely known in Boston in 1761, although the reporting of the case is untraditional. Much of what is known about the case comes from the notes of John Adams regarding the argument of James Otis, Jr. (hereinafter "Otis"). Otis would later serve in the Stamp Act Congress with Dickinson in 1765.

Writs of assistance were a type of general warrant that authorized government officials to look for smuggled materials. "Prior to 1755, local customs officers carried out warrantless searches under an assumed power of forcible entry *ex officio*. Massachusetts residents vigorously opposed these intrusions, thereby impelling Governor William Shirley to begin issuing his own warrants to customs officers." Tracy Maclin, The Complexity of the Fourth Amendment: A Historical Review, 77 B.U.L. Rev. 925, 945 (2014) (footnote omitted). Nonetheless, "opposition to gubernatorial warrants forced Shirley to order his officers to obtain writs of assistance from the judiciary." *Id*. (footnote omitted).

Writs of assistance were valid for six months after the death of the sovereign. The death of King George II in 1760, among other reasons, resulted in Boston merchants opposing renewal of the writs. One Boston

customs official who had been using writs of assistance at the time was Charles Paxton. Paxton utilized what we now would refer to as confidential informants to learn of places where smuggled goods were being kept. *See* M.H. Smith, The Writs of Assistance Case, 128 (1978).

Sixty-three Boston merchants petitioned against the continued issuance of the writs. *Id*. at 131. Otis resigned his position as advocate general to the vice-admiralty court in order to avoid defending the writ and was retained by the Boston merchants. The Boston surveyor general of customs, Thomas Lechmere, issued a "memorial" to the Massachusetts Superior Court asking that his council be heard on the subject so that writs of assistance could be issued to his officers.[3] *Id*. at 130. The case was heard in February and November of 1761.

Otis began by stating that such writs were "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law-book." *Gary*, *supra* at 145 (Todd, J., dissenting). While Otis was unsuccessful in persuading the colonial Massachusetts Superior Judicial Court, it would become difficult for such writs to be enforced in various colonies even in the face of direct

_____

[3] It appears that in November 1760, James Cockle, a Salem, Massachusetts customs official, had petitioned for a writ of assistance prior to the death of King George II. The question was to be considered in February of 1761 by the Massachusetts Superior Court. *See* M.H. Smith, The Writs of Assistance Case, 135-148 (1978) (providing a thorough discussion on how the case arrived before the Massachusetts Superior Court).

parliamentary authorization.  **See Gary**, **supra** at 146 (Todd, J., dissenting) (discussing Pennsylvania and Connecticut opposition).

John Adams, many years later, would write, "Then and there, the child Independence was born." **See Frank v. Maryland**, 359 U.S. 360, 364 n.3 (1959).  Adams himself would introduce the use of the phrase "unreasonable" into constitutional search and seizure provisions when crafting the Massachusetts prohibition against unlawful searches and seizures for the 1780 Massachusetts Constitution.[4]  According to one modern leading Fourth Amendment scholar, Adams construed "unreasonable" as meaning "inherent illegality or unconstitutionality[.]"  Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 555 (1999); **see also id**. at 555 n.5.

_____

[4] The original Massachusetts provision read:

> Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions.  All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in a warrant to a civil officer, to make search in all suspected places, or to arrest one or more suspected persons, or seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure; and no warrant ought to be issued, but in cases and with the formalities prescribed by the laws.

Mass.Const. Declaration of Rights, Art. XIV (1780), reprinted in The Constitutions of the Several Independent States of America, at 45-46 (London, 2nd ed. 1783).

One of this Commonwealth's most illustrious attorneys and an early constitutional commentator, William Rawle, described the Fourth Amendment as follows. "Here again we find the general terms which prohibit all violations of these person rights, and of course extend both to the state and the United States.[5] The term unreasonable is used to indicate that the sanction of a legal warrant is to be obtained, before such searches or seizures are made." William Rawle, A View of the Constitution of the United States of America, at 127 (Philadelphia, 2nd ed. 1829).

Importantly, it was not just in Massachusetts where opposition to general warrants was voiced. In Pennsylvania, "our Court's colonial predecessor, along with that of Connecticut, was unique in basing its refusal to issue such writs on the fact that they failed to restrict searches to only specific places and enumerated items and did not require an official to disclose to a judicial officer, prior to a search, his reasons for conducting it." *Gary*, *supra* at 146 (Todd, J., dissenting).

There is, of course, little dispute that the framers of the Pennsylvania Declaration of Rights and those who framed and ratified the Fourth

_____

[5] Rawle was writing before Chief Justice John Marshall's decision in ***Barron v. Baltimore***, 32 U.S. 243 (1833), which held that the Fifth Amendment did not apply to the states. Rawle himself distinguished between which amendments he believed applied to the states and those that did not. The Fourteenth Amendment has subsequently been interpreted to require the application of much of the first eight amendments in the federal constitution to the states.

Amendment did not intend for warrants to be required for all searches and seizures. As of 1790, there were recognized common law exceptions to the prohibition against warrantless arrests and searches.  These exceptions applied to both private citizens and law enforcement.

Framing-era law enforcement could only justify felony warrantless arrests if a felony in fact had been committed, and such an arrest was ordinarily required to be based on exceptional circumstances.  ***Wakely v. Hart***, 6 Binn. 316, 318 (Pa. 1814) (emphases in original) ("it is no where said, that there shall be no arrest without warrant. To have said so would have endangered the safety of society. The felon who is seen to commit murder or robbery, must be arrested on the spot or suffered to escape. So although not seen, yet if known to have committed a felony, and *pursued* with or without warrant, he may be arrested by any person."); ***see also*** Davies, at 578 (citing James Wilson's law lectures of 1790-1791 contained in 2 The Works of James Wilson, 685 (Robert G. McCloseky ed., 1967)).

The exceptions generally applied to prevent escape.  ***Wakely***, ***supra***; William Waller Hening, The New Virginia Justice, 71, 303-305 (Richmond, 2nd ed. 1810) (warrantless arrests allowed where person views a felony, dangerous wounding, breach of peace, and is in fresh pursuit); ***compare id***. at 51 ("a constable hath no power to arrest a man for an affray done out of his own view, without a warrant from a justice, unless a felony were done,

or likely to be done");[6] *see also Kimball v. Munson*, 2 Kirby 3 (Conn. 1786). Law enforcement could also make a warrantless entry to prevent an escape if there was an affray or breach of the peace. *Knot v. Gay*, 1 Root 66, 67 (Conn. 1774); Hening, *supra* at 74.

Of course, a public offense committed or attempted in the person's presence could permit any person to arrest even for a misdemeanor. Hening, *supra* at 50-51, 71. Importantly, during the 18th century, most crimes were misdemeanors. *See* 5 Tucker's Blackstone, 216 (Philadelphia, 1803) (defining assaults, batteries, wounding, false imprisonment, and kidnapping as misdemeanors).[7] Serious crimes such as aggravated assault and kidnapping were not felonies; indeed, the term "felony" at common law was largely synonymous with capital crimes.

In addition to arrest authority being extremely limited unless the crime was observed by the arrestor, so too was the ability to enter a residence without permission. "From the earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an

---

[6] An affray was defined by William Waller Hening, in his justice of the peace manual, as "the fighting of two or more persons in some public place, to the terror the people." William Waller Hening, The New Virginia Justice, 49 (2nd ed. Richmond, 1810).

[7] Blackstone's Commentaries on the Laws of England consisted of four books. St. George Tucker, frequently referred to as America's Blackstone, was one of America's earliest constitutional commentators and annotated Blackstone for purposes of teaching law at the College of William and Mary. His annotated commentaries consisted of five volumes.

arrest[,]" ***Miller v. United States***, 357 U.S. 301, 306 (1958), even when the officer had a warrant.  The home as a person's castle dates back to at least ***Semayne's Case***, 77 Eng.Rep. 194 (1603).  Therein, the court declared that "in all cases when the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him or to do other execution of the King's process, if otherwise he cannot enter.  But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors[.]"  ***Ker v. California***, 374 U.S. 23, 47 (1963) (quoting ***Semayne's Case***, ***supra*** at 195); ***see also Miller***, ***supra*** at 308; Hening, ***supra*** at 73-75, 303-304.

Importantly, ***Semayne's Case*** was referencing when a sheriff actually was executing the King's process, *i.e.*, a warrant.  Similarly, William Hawkins, in his influential 18th century criminal treatise, maintained: "where one lies under a probable Suspicion only, and is not indicted, it seems the better Opinion at this Day, That no one can justify the Breaking open Doors in Order to apprehend him."  ***Miller***, ***supra*** at 308.  Nonetheless, another leading English legal commentator, Matthew Hale, in his well-known Pleas of the Crown, did opine, "A man, that arrests upon suspicion of felony, may break open doors, if the party refuse upon demand to open them[.]"  ***Ker,*** ***supra*** at 48 n.1 (quoting 1 Hale, Pleas of the Crown, 583 (1736)); Henings, ***supra*** at 73.  Citing Hale and Hawkins, William Blackstone in his influential

Commentaries condemned general warrants and also voiced disapproval of general criminal warrants. *See* 5 Tucker's Blackstone, 291.

Since the constitutional prohibitions against general warrants was because such warrants provided discretionary authority to constables, customs officers, and other peace officers, "it is wholly implausible that the Framers would have approved of broad use of warrantless intrusions, because such intrusions would necessarily have rested solely on the officers' own judgment." Davies, *supra* at 582.

A warrantless seizure or search at that time, unlike today, permitted resistance,[8] allowed a civil suit for trespass damages and false imprisonment against magistrates and police, *see Grumon*, *supra*,[9] and could potentially result in criminal prosecution. Federalist Paper 83, reprinted in The Federalist Papers, 499 (Charles R. Kesler, ed. 1961) (Alexander Hamilton discussing bringing criminal charges for customs officers who exceeded their

_____

[8] *State v. Curtis*, 2 N.C. 471 (1797) ("as the officer did not tell *Curtis* for what he arrested him, and the warrant he had was not under seal, *Curtis* who resisted, and beat him for making the arrest, was acquitted."); *Coyle v. Hurtin*, 10 John 85 (N.Y. 1813); *State v. Worley*, 33 N.C. 242, 243 (1850) ("a seal is essential to every warrant, issued by a magistrate to arrest any person upon a criminal charge. If there be no seal, the precept is void and affords no protection to the officer attempting to execute it; and, if its execution is resisted by the defendant, he is guilty of no offence against the law, though, in doing so, the person of the officer be assaulted.").

[9] *See also* Roger Root, The Originalist Case for the Fourth Amendment Exclusionary Rule, 45 Gonzaga L.Rev. 1, 10 n.45 (2010) (collecting cases).

authority); *cf*. *State v. Armfield*, 9 N.C. 246 (1822); *State v. Brown*, 5 Del. 505 (1854).  Hence, warrantless searches were, in general, unlawful and, therefore, unreasonable.

As mentioned, at English and early American common law, law enforcement officials could only enter a private home, even with a warrant, where those inside were made aware of the presence of someone outside and those inside refused a demand to open the door. *Semayne's Case*, *supra*;[10] *Curtis' Case*, 168 Eng.Rep. 67 (1756); 2 Hawkins, Pleas of the Crown, 86-87 (1721) (asserting that an officer could enter a house if he believed violence was occurring inside or was in pursuit of a person he witnessed commit an affray or felony); 1 Hale, Pleas of the Crown, 582-583, 588-589 (1736);[11] 1 Joseph Shaw, The Practical Justice of Peace, 76 (4th ed. 1744); Hening, *supra* at 73-75; 1 Burn, Justice of the Peace, 275-276 (28th ed. 1837).

American cases authorizing forcible entry into a home required exceptional circumstances.  For example, if a felon escaped after arrest, an officer or private citizen in fresh, *i.e.*, hot pursuit, could enter a house that

---

[10] In *Semayne's Case*, Lord Coke indicated that a warrantless entry was authorized only where the criminal retreated into the home and was pursued, *i.e.*, hot pursuit of a fleeing felon.  77 Eng. Rep. at 196.

[11] In discussing warrantless entries, Hale also generally maintained that the person being pursued must be present.  2 Hale, Pleas of the Crown at 92, 95, 103.

- 25 -

the escapee took refuge in by breaking down the door. ***Ker***, ***supra*** at 54-55; ***see also*** 5 Tucker's Blackstone, 293; Hening, ***supra*** 73-74, 218 ("wherever a person is lawfully arrested for any cause, and afterwards escapes, and shelters himself in a house, the doors may be broken open to take him, on refusal of admittance"); ***compare also Read v. Case***, 4 Conn. 166 (1822).

However, there was no common law authority for a warrantless search in a home, other than a search for the fleeing individual or of an individual's person incident to an arrest. ***See generally*** William Cuddihy, The Fourth Amendment, Origins and Original Meaning (2009); ***cf***. ***Sailly v. Smith***, 11 Johns 500 (N.Y. Sup. 1814) (questioning, in *dicta*, a statute's authorization of warrantless home searches by a customs official, despite New York having no constitutional prohibition against unreasonable searches or seizures at the time).

In sum, at the time of Pennsylvania's early constitutions, it was generally recognized by the people that an unreasonable search and seizure occurred unless a specific warrant authorized the search or seizure. Hot pursuit after observing a felony was one exception to the warrant requirement. Further, it was unreasonable to enter a home with or without a warrant without knocking and announcing. No destruction of evidence exception to a specific warrant requirement before entering a home was regularly claimed at the time of the founding.

Two Pennsylvania Supreme Court cases regarding exigent circumstances, which have been the subject of criticism and curtailed on other grounds, *Commonwealth v. Mason*, 637 A.2d 251 (Pa. 1993), and *Commonwealth v. Melendez*, 676 A.2d 226 (Pa. 1996), are implicated in this case. In *Mason*, an undercover police officer met with an individual to purchase cocaine. That person and a police informant traveled to an apartment complex to purchase the cocaine with money the officer provided. A different undercover officer witnessed the individual enter a specific apartment and return to a car occupied by the other undercover officer and informant.

After the undercover officer exited the car, police arrested the individual two blocks from the apartment. The arrested individual identified the apartment where he bought the cocaine and stated that it housed additional cocaine. Police then elected to get a search warrant. However, before the warrant was secured, another officer forcefully entered the apartment, fearful that the cocaine would be destroyed. Specifically, an officer knocked on the door for two minutes without receiving a response. He did not identify himself as police. Police then used a battering ram to break down the door.

The *Mason* Court stated that the "sole issue in the case is whether the trial court properly denied Mason's motion to suppress evidence seized in alleged violation of Article I, Section 8 of the Constitution of Pennsylvania."

*Mason*, *supra* at 253.  Ultimately, the *Mason* Court found such a violation.  Mason argued that the entry was illegal, there were no exigent circumstances, and that the independent source doctrine in Pennsylvania was not identical to federal constitutional jurisprudence.  Beginning with the premise that the entry was unlawful under the Pennsylvania Constitution,[12] the Court rejected adopting the federal independent source rule in *Murray v. United States*, 487 U.S. 533 (1988).  *But see Commonwealth v. Henderson*, 47 A.3d 797 (Pa. 2012).

The *Mason* Court concluded by holding that forcefully entering the apartment without exigent circumstances and a warrant was an unconstitutional violation of Article I, § 8.  In doing so, the Court opined that there must be more than suspicion that destruction of evidence might occur.  Thereafter, in *Melendez*, *supra*, the Court found a warrantless entry into a home illegal.  There, police were watching a residence for three weeks.  While awaiting approval of a search warrant, police stopped the defendant in her car after she left the house.  A search revealed a handgun and large amount of cash.  This stop and search was deemed unlawful by the *Melendez* Court.  Police then drove the defendant back to the house and used her keys to enter.  Upon entering, the police saw an individual with a bag of cocaine.

---

[12] If the entry had been considered lawful, then the Court would not have had to engage in any discussion of the independent source doctrine.

The **Melendez** Court opined, "if the police created a danger that their surveillance might be discovered because they stopped Melendez's car, they can hardly be allowed to rely on that to justify a warrantless intrusion. Had the police simply waited for the search warrant, they could have searched the dwelling[.]" **Melendez**, **supra** at 229. It then maintained, under the Pennsylvania Constitution, "If the concern was that police activity might have been witnessed by a person remaining in the house who might begin to destroy evidence, such a possibility is of no legal consequence, for police may not create their own exigencies, which they then use as justification for exclusion from normal warrant requirements." **Id**. at 230.

Most recently, in **Commonwealth v. Johnson**, 68 A.3d 930 (Pa.Super. 2013), this Court discussed **Mason**, **Melendez**, **Demshock**, **Waddell**, and, in two footnotes, quoted extensively from **King**. In **Johnson**, police received information from two anonymous sources regarding ongoing drug activity at a trailer park. One informant reported that an older white female with red hair was involved. Police responded to the area and encountered a person matching that description. They did not arrest her and, after informing her that they were police, asked her to leave the vicinity. The officers, as they climbed the steps to a residence earlier identified as the place where drugs were being sold, detected a strong odor of marijuana. They then knocked and the door was opened by the defendant.

The officers observed that the trailer was smoke-filled and the odor of burning marijuana was even stronger. Police asked if they could speak with the defendant inside. The defendant refused, swearing at the officers. The officers instructed the defendant that they would return with a warrant and attempted to restrain the defendant from re-entering the premises while they secured the warrant. The defendant struggled with police before they placed him under arrest. In response to a question, he indicated that another person was inside the residence. Accordingly, two officers again knocked and asked for the occupant to respond. When no one answered, the police entered. The police then encountered the defendant's wife, who asked them to leave. Police informed her that they were securing the residence for the arrival of a warrant and looked into several rooms to see if anyone else was present. They did not search for contraband, and only observed a burning marijuana cigarette in plain view. We upheld the police actions.

In light of the above constitutional analysis and consistent with **Mason** and **Melendez**, we decline to jettison long-standing Pennsylvania constitutional law that prohibits actual police-created exigencies to justify a warrantless arrest. Nonetheless, we do not find that, under the facts of this case, the police created an exigency since their actions were consistent with the limited authority afforded peace officers at the time of the passage of Pennsylvania's 1776 and 1790 constitutions.

Here, police personally observed the drug transactions. They then pursued the culprit, knocked, asked to speak to the renter, and announced that it was police before entering. These actions are consistent with allowable, *i.e.*, reasonable, 18th century common law practice. **See also Commonwealth v. Govens**, 632 A.2d 1316, 1326-1327 (Pa.Super. 1993) (*en banc*) (discussing Fourth Amendment and police created exigency law). Police only forcibly entered after the renter refused to open the door, again a practice not prohibited by the 1776 and 1790 constitutions. Further, police did not uncover the drugs in question by undertaking an overbroad and prohibited search of the entire residence on the grounds that it was incident to arrest. Rather, the drugs were seized in plain view. Thus, this case is markedly different from **Mason**, **Melendez**, and even **Demshock** and **Waddell**, which both relied on the Fourth Amendment.

The defendant in **Mason** was not personally observed committing a crime. Instead, police witnessed a different individual commit the drug transaction after leaving the residence of the defendant. Further, while a police officer did knock, he did not announce that he was an officer and testified that he intended to pose as a maintenance worker.[13] Hence, the

_____

[13] We are aware that at trial, but not during the suppression hearing, one officer in this case did indicate that he initially identified himself as a maintenance worker and covered the outside peep hole. However, consistent with the suppression hearing testimony of a separate officer, the police did announce their presence before entering. Pursuant to **In re L.J.**, *(Footnote Continued Next Page)*

forced warrantless entry in *Mason* was not consistent with the common law warrant exceptions when the early Pennsylvania Constitutions went into effect. Phrased differently, there was no fresh pursuit of a felon after personally witnessing the commission of the crime and an announcement after knocking.

*Melendez* involved even more egregious police action. There, police did not have grounds to stop the defendant, having observed no suspicious activity on her part. Police then transported the defendant back to her residence and directed her to open her door. Not a single common law exception to warrantless entry into a defendant's home applied. With respect to *Demshock*, police witnessed a minor offense, underage drinking, occur inside the home. While knocking, police intentionally did not announce their presence. The minor nature of the offense and the failure to indicate they were police in order to gain entry are distinguishable facts from the present case.

Similarly, *Waddell*, though focusing on a Fourth Amendment analysis, is consistent with this decision and Pennsylvania constitutional jurisprudence. The distinction between *Waddell* and this matter is that therein the police did not observe any drug transactions, and the defendant

*(Footnote Continued)* ─────────────

79 A.3d 1073 (Pa. 2013), in analyzing suppression issues, we no longer consider evidence outside the suppression record. However, the *L.J.* decision was prospective and occurred after the suppression hearing in this matter. Thus, it does not affect this case.

was no longer inside, having exited out a window. **Waddell**, **supra** at 215. Under the common law at the time of the passage of Pennsylvania's first two constitutions, forced entry would have been unlawful because the fleeing felon was not inside and police were not in fresh pursuit after seeing the crime. For the aforementioned reasons, we find that the police in this matter did not violate Article I, § 8.

Having resolved Appellant's first two issues, we now consider his remaining claims. Appellant contends that his sentence is unconstitutional under **Alleyne v. United States**, 133 S.Ct. 2151 (2013). **Alleyne** held that facts that increase a defendant's mandatory minimum sentence are elements of the crime and must be proven beyond a reasonable doubt or a defendant's jury trial right is violated. Accordingly, many mandatory minimum sentencing statutes in Pennsylvania are no longer constitutionally sound. **See Commonwealth v. Watley**, 81 A.3d 108 (Pa.Super. 2013) (*en banc*). More recently, this Court has held that the statute governing drug mandatories, at issue here, is unconstitutional as a whole and that a sentence under such a provision is illegal.[14] **Commonwealth v. Cardwell**,

_____

[14] Writing solely for myself in the case herein, I note that I have disagreed with the rationale expressing that our mandatory minimum sentencing statutes are not severable. **See Commonwealth v. Bizzel**, 107 A.3d 102 (Bowes, J., concurring); **Commonwealth v. Wolfe**, 106 A.3d 800 (Bowes, J., concurring). I continue to adhere to that view. Nonetheless, even absent the severability decisions relative to the mandatory sentencing statutes, Appellant's sentence does not fall within the **Alleyne** harmless error analysis
*(Footnote Continued Next Page)*

105 A.3d 748 (Pa.Super. 2014); *see also Commonwealth v. Thompson*, 93 A.3d 478 (Pa.Super. 2014) (defendant entitled to resentencing pursuant to *Alleyne* where the weight of the drugs was not determined by a jury beyond a reasonable doubt). Accordingly, Appellant is entitled to sentencing relief.

Appellant's final claim contests the sufficiency of the evidence as to his hindering apprehension conviction. Ordinarily, we address sufficiency claims at the outset because they entitle the defendant to discharge. *See Commonwealth v. Toritto*, 67 A.3d 29 (Pa.Super. 2013) (*en banc*) However, since Appellant was convicted of multiple charges, he would only be entitled to discharge on this crime and his remaining issues pertained to his other convictions. Accordingly, we have addressed the issue in the order presented.

In conducting a sufficiency of the evidence review, we view all of the evidence admitted, even improperly-admitted evidence. *Watley*, *supra* at 113. We consider such evidence in a light most favorable to the Commonwealth as the verdict winner, drawing all reasonable inferences from the evidence in favor of the Commonwealth. *Id*. When evidence

*(Footnote Continued)* _____

posited by myself in *Bizzel* or the majority in *Commonwealth v. Watley*, 81 A.3d 108 (Pa.Super. 2013) (*en banc*). Phrased differently, the jury verdict in this case does not make it clear that it determined that Appellant possessed the requisite weight of heroin beyond a reasonable doubt. *See Commonwealth v. Thompson*, 93 A.3d 478 (Pa.Super. 2014).

exists to allow the fact-finder to determine beyond a reasonable doubt each element of the crimes charged, the sufficiency claim will fail. *Id*.

The evidence "need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Id*. In addition, the Commonwealth can prove its case by circumstantial evidence. Where "the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances[,]" a defendant is entitled to relief. This Court is not permitted "to re-weigh the evidence and substitute our judgment for that of the fact-finder." *Id*.

Instantly, Appellant's challenge relates to his allowing Nicole Dudek to stay with him when she was wanted by police. Dudek had informed Appellant that police were seeking to arrest her based on discovering heroin at her home. The crime of hindering apprehension is defined in pertinent part as follows, "A person commits an offense if, with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime or violation of the terms of probation, parole, intermediate punishment or Accelerated Rehabilitative Disposition, he: (1) harbors or conceals the other[.]" 18 Pa.C.S. § 5105(a)(1).

Appellant argues that Ms. Dudek's testimony revealed that he told her to turn herself in after she stayed one night at his residence. According to Appellant, his instructions to her reveal a lack of criminal intent to harbor

Ms. Dudek. Appellant continues that, even if the jury believed Ms. Dudek was lying about him telling her to turn herself in to police, there was no other evidence that he harbored her.

The Commonwealth responds that Appellant's own argument defeats his claim. It maintains that Appellant concedes that he allowed Ms. Dudek, a known fugitive, to stay with him. The Commonwealth submits that it is immaterial that he asked her to turn herself in after he already harbored her for one night. It asserts that Appellant gave shelter to a fugitive, which is sufficient evidence to sustain the jury's finding. We agree. Viewing the evidence in a light most favorable to the Commonwealth, Appellant permitted a known fugitive to stay with him and only expressed his desire that she turn herself over to police after he allowed her to spend the night. Appellant's sufficiency claim fails.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/22/2015</u>