J-S04010-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANGEL APONTE, | |
| Appellant | No. 2842 EDA 2014 |

Appeal from the Judgment of Sentence September 5, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001449-2014

BEFORE:  SHOGAN and OTT, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY SHOGAN, J.:                **FILED FEBRUARY 10, 2017**

Appellant, Angel Aponte, appeals from the September 5, 2014 judgment of sentence entered in the Court of Common Pleas of Philadelphia County following a stipulated waiver trial.  We affirm.

The trial court summarized the facts of the crime as follows:[1]

> At the suppression hearing held on May 29, 2014, the Defendant moved for suppression of the firearm recovered in his

---

[*]  Former Justice specially assigned to the Superior Court.

[1]  The issue in this case assails the trial court's denial of Appellant's suppression motion.  When the matter herein proceeded to a stipulated waiver trial following the suppression hearing, the suppression testimony was incorporated and made part of the trial record.  Thus, the trial court's summarization of the facts utilizes the evidence presented at the suppression hearing that ultimately was incorporated in the trial record.  **See In re L.J.**, 79 A.3d 1073 (Pa. 2013) (scope of review in suppression matters is confined to the suppression hearing record).

case, claiming that the police did not have reasonable suspicion to stop him and that his flight after that unlawful stop, resulted in his forced abandonment of a firearm under Commonwealth v. Matos[, 672 A.2d 769 (Pa. 1996)] and therefore, the firearm should be suppressed. The evidence presented at the suppression hearing can be summarized as follows.

On January 18, 2014, at approximately 8:30 p.m., Officer [Christopher] Shevlin and his partner, Officer Gorman,[2] were in uniform, in a marked police vehicle, on routine patrol in the 25th Police District, in the general area of Gurney and Mascher Streets, Philadelphia, Pennsylvania.[4] Officer Shevlin was quite familiar with this area. He had been assigned to the 25th District for approximately seven (7) years and he was commonly assigned to patrol the area of Gurney and Mascher Streets. Officer Shevlin described the area as a high crime, high narcotics area that generated a lot of calls. He testified that he had made more than … 100 arrests in the area, for offenses involving narcotics, guns and assaults. N.T. 5/29/2014 at 4-6, 11.

> [4] Officer Shevlin was the recorder, sitting in the passenger seat. N.T. 5/29/2014 at 6,13.

Officers Shevlin and Gorman were traveling westbound on Gurney Street, towards Mascher Street, when Officer Shevlin observed a crowd and what seemed like a commotion on Waterloo Street.[5] At that time, Officer Shevlin also observed the Defendant running eastbound on Gurney Street, towards the police vehicle and the crowd on Waterloo Street. The Defendant was running with his hands and arms closed. The Defendant was approximately two car lengths from the police vehicle, and a half block from the crowd on Waterloo Street, when he looked directly at the police vehicle, completely stopped in the tracks of running, turned right around and started running back towards Mascher Street. Id. at 6-7, 8-9.

> [5] Officer Shevlin described the crowd as "an abnormally large amount of people," noting that as they were driving [past] Waterloo Street, both he and Officer Gorman uttered, "There's a lot of people

---

[2] Officer Gorman's given name is not included in the certified record.

on that block." [N.T., 5/29/14,] at 14. At that point, the officers were in a state of motion—traveling westbound on Gurney, towards Mascher. Id. They were most likely going back to investigate the crowd on Waterloo Street. Id.

Officer Shevlin found it suspicious that the Defendant was running full fledged, made eye contact with the police, turned around and ran in the opposite direction. Officer Shevlin wanted to investigate. Officers Shevlin and Gorman turned onto Mascher Street, where Officer Shevlin observed the Defendant stop near a vehicle.[6] The officers pulled alongside of the Defendant, but remained in their vehicle, which was approximately 10 feet from the Defendant. Speaking through his car window, Officer Shevlin asked the Defendant to come over for a second. The Defendant backed away, with his hands close to his body. Officer Shevlin did not know if the Defendant had anything or why he was running from the police. He decided to exit the vehicle and investigate further. Id. at 7, 10, 15.

> [6] There was no indication that the officers followed the Defendant at a high rate of speed or that they activated their emergency lights or siren.

As Officer Shevlin opened the door of his vehicle, the Defendant backed up further, put his hands towards his hoodie pocket, at his front waist area, like he was holding something in and he spontaneously stated that he did not have anything.[7] Officer Shevlin began to walk closer to the Defendant and the Defendant took off running southbound on Mascher Street. Officer Shevlin pursued the Defendant on foot. During the pursuit, Officer Shevlin observed the Defendant throw a heavy chrome object, which the Defendant had pulled from the front of his body. The object landed in a yard/alley area, making a sound as it hit the fence. The Defendant was subsequently apprehended. Id. at 7-8, 10-11.

> [7] Officer Gorman had remained seated in the police vehicle, which was approximately 10 feet from the Defendant[,] and neither officer had drawn [his] weapon[]. Id. at 10-11.

Trial Court Opinion, 1/14/16, at 2–3 (one footnote omitted).

The trial court summarized the procedural history as follows:

On January 18, 2014, Angel Aponte (the Defendant) was arrested and charged with possession of a firearm prohibited, firearm not to be carried without a license and carrying a firearm in public.[1] On April 22, 2014, the Defendant filed a motion to suppress the firearm recovered in association with his case. Following a hearing on the motion and a stipulated waiver trial held on May 29, 2014, this [c]ourt found the Defendant guilty of the all crimes charged.[2] On September 5, 2014, this [c]ourt sentenced the Defendant to five to ten years of incarceration for the crime of possession of a firearm prohibited, with no further penalty imposed on the remaining two crimes. On October 3, 2014, the Defendant filed a notice of appeal. On November 7, 2014, this [c]ourt filed a 1925(b) Order. On December 1, 2014, Defendant filed a 1925(b) Statement.

[1] 18 [Pa.C.S.] §§ 6105, 6106[,] and 6108, respectively.

[2] At the suppression hearing, the Commonwealth presented the testimony of Philadelphia Police Officer Christopher Shevlin. The Defendant did not present any evidence. N.T 5/29/2014 at 3-16. This [c]ourt denied the Defendant's suppression motion. Id. at 19-20. Immediately thereafter, the matter proceeded to a stipulated waiver trial, wherein Officer Shevlin's testimony was incorporated and made part of the trial record. Additionally, the parties stipulated that the police recovered a [.]22 caliber handgun that was loaded and operable and that the Defendant was prohibited from possessing a firearm due to a prior conviction for possession with intent to deliver. Id. at 20-24.

Trial Court Opinion, 1/14/16, at 1.

Appellant raises the following single issue for our review:

1. Did the [c]ourt err when it found that there was reasonable suspicion for the officers to stop [Appellant] for investigation when they merely saw him running in their direction and then change direction?

- 4 -

Appellant's Brief at 4.

The standard of review an appellate court applies when considering an order denying a suppression motion is well established.

> In evaluating a suppression ruling, we consider the evidence of the Commonwealth, as the prevailing party below, and any evidence of the defendant that is uncontradicted when examined in the context of the record. **Commonwealth v. Sanders**, 42 A.3d 325, 330 (Pa. Super. 2012). This Court is bound by the factual findings of the suppression court where the record supports those findings and may only reverse when the legal conclusions drawn from those facts are in error. **Id**.

**Commonwealth v. Haynes**, 116 A.3d 640, 644 (Pa. Super. 2015), *appeal denied*, 125 A.3d 1199 (Pa. 2015).

> "'Interaction' between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained." **Commonwealth v. DeHart**, 745 A.2d 633, 636 (Pa. Super. 2000). The three levels of interaction are: mere encounter, investigative detention, and custodial detention. **Id**.
>
>> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>>
>> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative

> detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Id*. (internal citations and quotation marks omitted).

***Commonwealth v. Tam Thanh Nguyen***, 116 A.3d 657, 664 (Pa. Super. 2015).

At the suppression hearing, defense counsel indicated that he had no witnesses to present.[3] When the trial court requested the basis for his suppression motion, counsel stated, *inter alia*: "In this case the police did not have reasonable suspicion or probable cause to stop [Appellant] and that his flight, after that unlawful stop, resulted in the throwing of the firearm, which is a forced abandonment . . . ." N.T., 5/29/14, at 4.

Appellant asserts on appeal that the trial court erred in failing to suppress the gun because Officer Shevlin "was completely unable to articulate reasonable suspicion to stop" Appellant. Appellant's Brief at 10. In support, Appellant underscores Officer Shevlin's testimony that when Appellant saw police, he turned and ran the other way, and "it seemed suspicious that he was running full fledged, and turned back around and ran back the other way." N.T., 5/29/14, at 10; Appellant's Brief at 14. Appellant maintains that his act of running cannot be categorized as "flight." Appellant's Brief at 15.

---

[3] Because the defense did not present any witnesses at the suppression hearing, "the Commonwealth's evidence is essentially uncontradicted." ***Commonwealth v. Smith***, 979 A.2d 913, 917–918 (Pa. Super. 2009).

At the conclusion of the suppression hearing, the trial court advanced its findings of fact, as follows:

> On January 18, 2014, while in uniform and driving a marked vehicle, Officer Shevlin, with his partner, Officer Gorman, was operating a vehicle westbound [on Gurney Street] towards Mascher Street, when [Officer Shevlin] observed a large crowd. At that point, Officer Shevlin observed the defendant running towards the crowd. The defendant appeared to look directly at the police vehicle, turn[ed] around and r[a]n in the opposite direction. The defendant was eventually stopped and when Officer Shevlin asked [him] to come here, the defendant backed up and said, I don't have anything and then ran southbound on Mascher Street.
>
> Officer Shevlin observed the defendant throw a chrome object into a yard/alley area. Officer Shevlin testified that he's a seven-year veteran of the 25th Police District and describes the area of Gurney and Mascher as a high-crime, high-narcotics area. He participated in greater than 100 arrests for narcotics, guns, and assaults.
>
> I find that Officer Shevlin had reasonable suspicion, as the defendant fled in a high-crime area.

N.T., 5/29/14, at 19.

Appellant's argument includes an inaccurate and unsupported premise, as well as being an incomplete description of the factors evaluated by police in pursuing Appellant. Appellant contends that police observed nothing more than Appellant running, whereupon he changed directions. Appellant then suggests that his subsequent abandonment of a loaded gun was coerced. Thus, Appellant claimed that his flight was provoked by Officer Shevlin's approach when he had done nothing wrong. Appellant's Brief at 6–7.

Instead, the testimony of record established that police came upon Appellant running at night, clutching his waist area, in a high-crime, high-narcotics area. N.T., 5/29/14, at 5–6. Officer Shevlin acknowledged to defense counsel that police wanted to make sure Appellant was "okay" after observing him running at night in the area where the commotion and crowd had formed. *Id*. at 15. Upon observing police, Appellant turned and ran the other direction. *Id*. at 7. When Appellant turned a corner and stopped near a vehicle, police, still in their marked police cruiser, asked Appellant to approach. *Id*. When Officer Shevlin exited the cruiser and stepped toward Appellant, Appellant moved his hands "towards his hoodie pocket in his jacket waist in the front" and spontaneously uttered, "I don't have anything." *Id*. As Officer Shevlin approached, Appellant "took off running," and Officer Shevlin pursued him on foot. *Id*. When Appellant turned a corner, the officer observed Appellant discard the chrome gun that was ultimately retrieved. *Id*. at 7.

Thus, the record supports the conclusion that the officers approached Appellant to ask if he was okay as he ran near a commotion in a high-crime location. At this point, therefore, the interaction was a mere encounter. When police asked Appellant to speak with them, and after spontaneously announcing he did not "have anything," Appellant took off running. N.T., 5/29/14, at 7. The ensuing question, then, is whether Appellant's unprovoked flight when coupled with his unaccompanied presence in a high-

crime area near a commotion and crowd, gave officers reasonable suspicion to believe criminality was afoot so as to justify an investigative detention.

In ***Illinois v. Wardlow***, 528 U.S. 119 (2000), the United States Supreme Court held that a police officer is justified in reasonably suspecting that an individual is involved in criminal activity when that individual: (1) is present in a high crime area, as here, and (2) engages in unprovoked, headlong flight after noticing the police. ***Id***. at 124–125.

Our Supreme Court has discussed such circumstances in ***In re D.M.***, 781 A.2d 1161 (Pa. 2001):

> [W]e see no reason at this juncture to embrace a standard other than that adhered to by the United States Supreme Court. Appellant is correct that our case law has questioned the relevancy of flight in reviewing the totality of the circumstances. Indeed, in our original opinion in ***D.M.***, we concluded that flight was not a factor that would weigh in favor of finding reasonable suspicion or probable cause under the totality of the circumstances test. [***Interest of D.M.***, 743 A.2d 422, 426 (Pa. 1999)]. Nevertheless, this conclusion has been directly contradicted by the United States Supreme Court's recent decision in ***Wardlow***.
>
> In ***Wardlow***, the Chicago police sent a four-car caravan into a high crime area to investigate drug activity. ***Wardlow***, 528 U.S. at 121, 120 S.Ct. 673. One of the officers in the last vehicle observed the respondent on a corner with an opaque bag in his hand. ***Id***. at 121–22, 120 S.Ct. 673. The respondent looked at the officers and fled. The officers cornered the respondent and upon exiting their car, immediately conducted a brief pat-down search for weapons. ***Id***. at 122, 120 S.Ct. 673. During the pat-down search of the respondent, the officer discovered a gun. The issue before the court was whether sudden flight in a high crime area created a reasonable suspicion justifying a ***Terry*** [***v. Ohio***, 392 U.S. 1 (1968)] stop. ***Id***. at 123, 120 S.Ct. 673.

In explaining that such a seizure was justified, the Court reiterated the **Terry** standard and concluded that an officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." **Id**. at 124, 120 S.Ct. 673. The Court acknowledged that mere presence in a high crime area was insufficient to support a finding of reasonable suspicion. However, a court could consider "the fact that the stop occurred in a 'high crime area'" in assessing the totality of the circumstances. **Id**. Similarly, the Court held that unprovoked flight could be considered among the relevant contextual considerations, since "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and "**headlong flight—wherever it occurs—is the consummate act of evasion**...." **Id**. Based upon respondent's unprovoked flight in a high crime area, the Court concluded that the officer was justified in suspecting that criminal activity was afoot.

Following this decision, it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a **Terry** stop under the Fourth Amendment. In light of this recent case law, it is clear that our original analysis in this case was contrary to the United States Supreme Court's subsequent analysis in **Wardlow**.

**D.M.**, 781 A.2d at 1163–1164 (emphasis added). This Court recently affirmed the denial of suppression where the appellant exhibited evasive, unprovoked flight in a high crime area. **Commonwealth v. McCoy**, 2017 PA Super 20, ___ A.3d ___ (Pa. Super. filed January 27, 2017). We held therein that the appellant therefore was not entitled to suppression of the gun he discarded during his flight. **Id**. at *4.

We conclude that the trial court properly denied Appellant's motion to suppress. In assessing whether an officer had reasonable suspicion to justify an investigatory detention, we must consider the totality of the circumstances. **Commonwealth v. Walls**, 53 A.3d 889, 893 (Pa. Super.

2012). While mere flight is not enough to constitute reasonable suspicion, ***Commonwealth v. Martinez***, 588 A.2d 513, 514 (Pa. Super. 1991), fleeing from an officer may constitute the basis for reasonable suspicion in certain instances, as a "combination of innocent facts, when taken together, may warrant further investigation by the police officer." ***Commonwealth v. Carter***, 105 A.3d 765, 772 (Pa. Super. 2014). Additionally, the court must afford weight to an officer's perception of the circumstances in light of the officer's experience. ***Id***. at 773.

Accordingly, based upon the foregoing, we reject Appellant's claim that the suppression court erred by denying his motion to suppress. The totality of the circumstances demonstrates that the police officers, in fact, had reasonable suspicion to believe that Appellant was engaged in criminal activity when they began their pursuit of him following his second flight in a high crime area. As Officers Shevlin and Gorman were attempting to effect a lawful investigatory detention at the time Officer Shevlin observed Appellant discard his loaded gun, the seizure of the firearm was constitutional, and Appellant's suppression motion was properly denied.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/10/2017